# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

BALDO BELLO,

      Plaintiff,

  v.

VILLAGE OF SKOKIE, ANTHONY
SCARPELLI, ALFREDO LOPEZ, MICHAEL
KRUPNIK, and CHRISTA BALLOWE,

      Defendants.

Case No. 14 CV 01718

Judge Matthew F. Kennelly

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## Table of Contents

Table of Contents ........................................................................................................... i

Table of Authorities ...................................................................................................... ii

INTRODUCTION ........................................................................................................ 1

STATEMENT OF MATERIAL FACTS ..................................................................... 1

ARGUMENT ............................................................................................................... 5

I.     Defendants' Exhibits 32 and 35 Must Be Excluded Pursuant to Fed. R. Civ. P. 37(c) ... 5

II.    Defendants Are Not Entitled to Summary Judgment on Plaintiff's USERRA Discrimination Claim ................................................................................................ 8

III.   Disputed Issues of Material Fact Preclude Summary Judgment on Plaintiff's USERRA Retaliation Claim ................................................................................... 14

   A.    Defendants' Actions Against Plaintiff Were Materially Adverse .................................. 14

   B.    The Evidence Establishes Causation Under the "Convincing Mosaic" Approach ........ 18

     1.    Suspicious Timing ................................................................................... 18

     2.    Pretext ...................................................................................................... 20

     3.    Similarly Situated Employees ................................................................. 23

IV.   The Individual Defendants Are Liable Under USERRA ............................................. 25

V.    The Tort Immunity Act Does Not Apply to Plaintiff's IWPA Retaliation Claim ......... 26

VI.   Defendants Are Not Entitled to Summary Judgment on Plaintiff's IMLOAA Claim ... 28

CONCLUSION ........................................................................................................... 30

**Table of Authorities**

## Cases

*Ashman v. Winnebago County Sheriff's Dept.*, 2015 WL 641784 (N.D. Ill. Feb 13, 2015)......... 26

*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006) ................. 15, 16, 17

*Buttebaugh v. Department of Justice*, 336 F.3d 1332 (Fed. Cir. 2003) ....................................... 12

*Cambridge Electronics Corp. v. MGA Electronics, Inc.*, 227 F.R.D. 313 (C.D. Cal. June 22, 2004)................................................................................................................................................ 8

*Carter Coal Co. v. Human Rights Commission*, 261 Ill. App. 3d 1 (1994)................................... 29

*Clegg v. Arkansas Department of Corrections*, 496 F.3d 922 (8th Cir. 2007)............................ 16

*Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012)....................................................... 18, 20, 23

*Covert v. Monroe County Dept. of Job & Family Svcs.*, 2010 WL 2346550 (S.D. Ohio June 8, 2010)................................................................................................................................................ 17

*Crews v. City of Mt. Vernon*, 567 F.3d 860 (7th Cir. 2009) ................................................. 12, 14

*Decatur Police Benevolent & Protective Ass'n Labor Committee v. City of Decatur*, 2012 IL App (4th) 110764 ............................................................................................................................. 29

*Dry Dock, LLC v. Godfrey Conveyor Co.*, 717 F. Supp. 2d 825 (W.D. Wisc. June 7, 2010) ........ 8

*Duncan v. U.S. Postal Service*, 168 F.3d 1322 (Fed. Cir. 1998) ................................................. 16

*Gross v. PPG Industries, Inc.*, 636 F.3d 884 (7th Cir. 2011) ...................................................... 14

*Harrison v. Hardin County Community Unit School Dist. No. 1*, 197 Ill. 2d 466 (2001)........... 27

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573 (2010)...................... 26

*Kostecki v. Dominick's Finer Foods, Inc. of Illinois*, 361 Ill. App. 3d 362 (2005)..................... 30

*Malec v. Sanford*, 191 F.R.D. 581 (N.D. Ill. Mar. 7, 2000)......................................................... 1

*Medina v. Board of Education of City of Chicago*, 2014 IL App (1st) 130588............................ 28

*Michael v. Caterpillar Financial Services Corp.*, 496 F.3d 584 (6th Cir. 2007) ........................ 17

*Minch v. City of Chicago*, 486 F.3d 294 (7th Cir. 2007) ............................................................ 26

*Montoya v. Orange County Sheriff's Dep't*, 987 F. Supp. 2d 981 (C.D. Cal. 2013)...................... 9

*Musser v. Gentiva Health Services*, 356 F.3d 751 (7th Cir. 2004) ............................................. 6, 7

*Nair v. Nicholson*, 464 F.3d 766 (7th Cir. 2006) ......................................................................... 15

*Peltier v. United States*, 388 F.3d 984 (6th Cir. 2004) ................................................................ 16

*Pignato v. American Trans Air, Inc.*, 14 F.3d 342 (7th Cir. 1994) ............................................. 13

*Valentino v. Village of South Chicago Heights*, 575 F.3d 664 (7th Cir. 2009) ........................... 27

*Wanless v. Illinois Human Rights Comm'n*, 296 Ill. App. 3d 401 (1998) ............................... 28, 29

*Weiler v. Village of Oak Lawn*, __ F. Supp. 3d __, 2015 WL 1538498 (N.D. Ill. Mar. 31, 2015)
.................................................................................................................................... 27, 29

## Statutes

38 U.S.C. § 4301(a)(3) ..................................................................................................................... 8

38 U.S.C. § 4311(a) ................................................................................................................... 8, 25

38 U.S.C. § 4311(b) ................................................................................................................. 14, 25

38 U.S.C. § 4311(c)(1) .................................................................................................................... 9

38 U.S.C. § 4311(c)(2) .................................................................................................................. 14

38 U.S.C. § 4323(e) ....................................................................................................................... 26

38 U.S.C. § 4323(h)(2) .................................................................................................................. 26

5 ILCS 315/15(b) ........................................................................................................................... 29

745 ILCS 10/2-201 ........................................................................................................................ 27

775 ILCS 5/7-101 .......................................................................................................................... 28

775 ILCS 5/8-102 .......................................................................................................................... 28

## Rules

Fed. R. Civ. P. 26(a)(1)(A)(i) ......................................................................................................... 6

Fed. R. Civ. P. 26(a)(1)(A)(ii) ........................................................................................................ 6

Fed. R. Civ. P. 26(e)(1) ................................................................................................................... 6

Fed. R. Civ. P. 37(c)(1) ................................................................................................................... 6

**Treatises**

31 Fed. Prac. & Proc. Evid. § 8045 (1st ed.) ................................................................................. 8

## INTRODUCTION

Plaintiff Baldo Bello, through his undersigned counsel, respectfully submits his memorandum of law in opposition to Defendants' Motion for Summary Judgment (Dkt. 74, 76-77). For the reasons stated below, the Court should deny Defendants' motion for summary judgment.

## STATEMENT OF MATERIAL FACTS

Defendants' statement of facts (Dkt. 77) is rife with immaterial facts, compound statements, hearsay, legal conclusions, and misstatements of the evidence contained in Defendants' own exhibits, all of which should be disregarded by the Court. *See Malec v. Sanford*, 191 F.R.D. 581, 583, 585 (N.D. Ill. Mar. 7, 2000). Plaintiff's objections to specific statements of fact are set forth in detail in his Local Rule 56.1(b)(3) response to Defendants' statement, and Plaintiff's own motion for summary judgment sets out the material facts regarding his USERRA discrimination (Count I) and IMLOAA (Count IV) claims. *See* Dkt. 79, at 1-2; Dkt. 80. In the interest of brevity, Plaintiff incorporates his previous statement of material facts (Dkt. 79, at 1-2) and notes here only additional material facts that require denial of Defendants' motion for summary judgment regarding Plaintiff's USERRA retaliation (Count II) and Illinois Whistleblower Protection Act (Count III) claims. *See* L.R. 56.1(b)(3)(C).

Members of the U.S. Marine Corps often use vernacular terms that are not commonly used by civilians, such as "ink stick" instead of "pen," or "bulkhead" rather than "wall." PASOF ¶ 7.[1] The word "kill" is one such vernacular term regularly used by Marines to express motivation, readiness, or as a greeting. PASOF ¶ 7. Marines also commonly use the term during roll-call

---

[1] The following abbreviations are used throughout for the parties' statements of fact: Plaintiff's Statement of Facts (Dkt. 80) ("PSOF"); Defendants' Statement of Facts ("DSOF"); and Plaintiff's Additional Statement of Facts ("PASOF").

situations to acknowledge their presence. PASOF ¶ 7. Marines are taught to use the term in this fashion as a response or sign of acknowledgment from their very first day of boot camp. PASOF ¶ 8. The use of the word "kill" does not mean that Marines intend or want to kill, but it is instead meant as a sign of readiness and motivation to go out and do their job with a heightened sense of awareness and to take on the day's problems to the best of their ability. PASOF ¶ 8.

Plaintiff has been employed as a patrol officer with the Skokie Police Department since January 2006. *See* Pl.'s Resp. DSOF, ¶ 14. Prior to September 2013, nearly every time that Plaintiff's name was called during roll call at the Department, Plaintiff would respond with the word "kill." *See* PASOF ¶ 9. Each time Plaintiff responded in this manner, he did so in a normal voice, and it was a normal, everyday occurrence. PASOF ¶ 9. No one had ever complained about Plaintiff's responses at roll call, and Plaintiff's coworkers found it motivating or treated it as a joke and thought it was funny. PASOF ¶ 10. Another officer, Mynor Chang, who was a Marine in Guatamala, also sometimes responded during roll call with the word "kill" when either his own name or Plaintiff's name was called. PASOF ¶ 11. Skokie Police Department supervisors, including sergeants, commanders, and the chief of police, were present at various times when Plaintiff responded with the word "kill" during roll call. PASOF ¶ 12. Prior to September 2013, no one had ever told Plaintiff to stop responding in this manner. PASOF ¶ 10.

Commander Krupnik became Plaintiff's watch commander for the first time in September 2012. Pl.'s Resp. to DSOF ¶ 54. In August 2012, even before Krupnik took command of Plaintiff's watch, Krupnik began questioning Plaintiff's requests for military leave for his monthly drills. PASOF ¶ 13. Plaintiff first began complaining about the Village's scheduling practice in September 2012, and he raised additional complaints during May 2013. PASOF ¶ 14. On May 21, 2013, Plaintiff filed a formal grievance challenging the Village's scheduling policy.

Pl.'s Resp. DSOF ¶ 83. The Village learned on June 13, 2013, that Plaintiff intended to file a lawsuit against the Village regarding the Village's scheduling policy. PASOF ¶ 15.

Because watch commanders rotate watches each quarter, Krupnik was Plaintiff's watch commander only from September to December 2012. Pl's Resp. DSOF ¶ 26. In September 2013, Krupnik rotated back to Watch III and once again became Plaintiff's commander. PASOF ¶ 16. On September 24, 2013 Krupnik suddenly approached Plaintiff and told him to stop saying the word "kill" in response to his name being called in roll (Pl.'s Resp. DSOF ¶ 88), despite having previously attended roll call almost every day that he worked the entire time he was commander (PASOF ¶ 17). When Plaintiff asked where the sentiment was coming from, Krupnik told Plaintiff that he was offended by it. Pl.'s Resp. DSOF ¶¶ 86, 90. Plaintiff understood Krupnik's order to "stop" to mean only that he should not respond with the word "kill" in front of Krupnik because he was offended by it. PASOF ¶ 20.

Unbeknownst to Plaintiff, Krupnik then approached one of Plaintiff's supervisors and ordered him to monitor Plaintiff's responses in roll. Pl.'s Resp. DSOF ¶ 92. On September 27, 2013, a day that Krupnik was not present at roll call, Plaintiff responded with "kill" during roll call out of longstanding habit and because to his knowledge Krupnik was the only one offended by the use of the term. PASOF ¶ 21. In the memorandum that he was subsequently ordered to write regarding the incident, Plaintiff explained his misunderstanding of Krupnik's order. PASOF ¶ 22. After Plaintiff submitted his memorandum, neither Lopez nor Scarpelli asked Plaintiff to explain the contents of his memorandum or what he meant prior to mandating Plaintiff to EAP and for a fitness-for-duty evaluation. PASOF ¶ 37.

Prior to September 2013, Plaintiff's disciplinary file contained no sustained disciplinary actions. PASOF ¶ 23. Moreover, the police department's general order on discipline states, "If

negligence or a simple misunderstanding is a factor, this should be pointed out in a constructive manner to the member/employee. Often, informal counseling is all that is required to correct the situation." PASOF ¶ 24. The general order further states, "If the member/employee simply misunderstood the facts, the supervisor should point this out in a counseling session conducted in a similar manner to that indicated where negligence is involved." PASOF ¶ 24. Despite the fact that Plaintiff had no prior sustained disciplinary actions in his disciplinary file and that he had indicated in his memorandum that he had misunderstood Krupnik's order (PASOF ¶¶ 22-23), Krupnik demanded that Plaintiff be suspended for two days without pay for insubordination (Pl.'s Resp. DSOF ¶ 108) and Lopez ultimately imposed a one-day suspension without pay (PASOF ¶¶ 25). In contrast, during September 2013, and after Krupnik made an issue out of Plaintiff saying "kill" in roll call, Officer Chang responded to his name being called with "kill," but no supervisor made an issue out of it and Chang was never reprimanded, disciplined, or otherwise told by a supervisor to stop saying "kill" during roll call. PASOF ¶ 26.

Plaintiff was placed on administrative leave while he underwent a mandatory supervisory referral to the Employee Assistance Program (EAP), ostensibly because of the content his memorandum. Pl.'s Resp. DSOF ¶¶ 98-99. However, the referral process did not follow Skokie Police Department guidelines regarding mandatory referrals, and at least two other similarly situated officers were not subjected to mandatory supervisory referrals. PASOF ¶¶ 27-30. Moreover, the referral to EAP was supposedly for the purpose of determining whether Plaintiff was a threat to himself or others (PASOF ¶ 32), which ComPsych, the EAP facilitator, quickly confirmed that Plaintiff was not ( PASOF ¶ 33). Despite the fact that ComPsych could not make recommendations regarding fitness for duty, Ballowe made the uncommon demand that the EAP provider to perform a fitness-for-duty evaluation on Plaintiff. PASOF ¶¶ 34-36. Even though

ComPsych and the EAP provider declined to provide such a recommendation (PASOF ¶¶ 34, 37), the Village ordered Plaintiff to undergo a psychiatric fitness-for-duty evaluation performed by Dr. Daniel O'Grady (Pl.'s Resp. DSOF ¶ 101). Dr. O'Grady found Plaintiff to be fit for duty and, while he suggested that Plaintiff would benefit from a series of personal counseling sessions, Dr. O'Grady emphasized that Plaintiff was fit for duty and that the Village could return him to duty at any time. Pl.'s Resp. DSOF ¶ 102. The Village, however, kept Plaintiff on desk duty until Ballowe and Lopez authorized Plaintiff to return to full duty after the conclusion of the series of personal counseling sessions. Pl.'s Resp. DSOF ¶ 105; PASOF ¶ 38.

The Village's actions against Plaintiff also affected other officers. Officer Patrick Howe, who was also a Marine reservist, was deterred from complaining about the policy by the Village's actions against Plaintiff, despite the fact that the policy negatively impacted him to such an extent that he later felt compelled to resign from the Marine Corps because of it. PASOF ¶ 39.

## ARGUMENT

### I. Defendants' Exhibits 32 and 35 Must Be Excluded Pursuant to Fed. R. Civ. P. 37(c)

Before addressing the merits of Defendants' arguments, a threshold procedural issue must be resolved. In support of their motion, Defendants have included a declaration by their attorney Roxana Crasovan (Ex. 32) (Dkt. 77-33) and Patrol Officer Summary Charts (Ex. 35) (Dkt. 77-36). Defendants neither produced Exhibit 35 nor identified Crasovan as a witness during discovery, and therefore Federal Rule of Civil Procedure 37(c) mandates that the exhibits be excluded on summary judgment.

Federal Rule of Civil Procedure 26(a)(1)(A)(i) requires each party to identify "each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use

would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i). Similarly, Rule 26(a)(1)(A)(ii) requires that parties produce "a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(ii). Rule 26(e) further requires that parties supplement or correct their initial Rule 26 disclosures and other discovery responses. *See* Fed. R. Civ. P. 26(e)(1). If a parties fails to either make or supplement a disclosure pursuant to either Rule 26(a) or (e), then "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless." *Musser v. Gentiva Health Services*, 356 F.3d 751, 758 (7th Cir. 2004).

There are two problems with the exhibits. First, Defendants never disclosed Roxana Crasovan as a witness either in their Rule 26(a) disclosures or in their responses to Plaintiff's interrogatories. PASOF ¶ 1. Given that Crasovan's declaration states that she personally created Defendants' Exhibit 35, which Defendants offer as substantive evidence under Federal Rule of Evidence 1006 to support their arguments (*see* Defs.' Ex. 32, ¶ 5), Crasovan should have been disclosed in Defendants' Rule 26(a)(1)(A)(i) disclosures because she had discoverable information that Defendants' clearly intended to use in support its defenses to Plaintiff's claims and is the foundational witness for the document. She should also have been disclosed in response to Plaintiff's First Interrogatories No. 3, among others,[2] which sought the identity of

---

[2] In the interest of reducing the number and size of exhibits to Plaintiff's statement of additional facts, Plaintiff has included only the Village's answers to Plaintiff's First Interrogatories. Interrogatory No. 3 was, however,

individuals in possession of documents pertaining to facts alleged in the pleadings. PASOF ¶ 1. Consequently, Defendants' failure to disclose Crasovan in their initial or supplemental discovery disclosures and responses violated Rules 26(a) and (e).

Second, Defendants never produced Exhibit 35 in discovery. PASOF ¶ 1. At a minimum, the document should have been produced or identified pursuant to Rule 26(a)(1)(A)(ii), which is mandatory even in the absence of a specific request. Even so, Plaintiff specifically requested production of all Rule 26 documents. PASOF ¶ 1 (citing to Ex. D, ¶ 4 (Village Answers to Plaintiff's First Request to Produce)). Defendants' failure to produce the documents contained in Exhibit 35 therefore also violated Rule 26(a) and (e).

Exclusion of the exhibits is thus mandatory unless Defendants can show that the failure was substantially justified or is harmless. *See Musser*, 356 F.3d at 758. That is a burden that Defendants cannot meet. Exhibit 35, which was created by Crasovan, is cited by Defendants in support of their contention that the Village has treated Plaintiff no differently that other police officer with respect to scheduling RDOs. *See* DSOF ¶¶ 29, 32, 33, 37, 38, *cited in* Defs.' Br. at 7-10; *see also* Defs.' Br. at 3. That very issue, however, was the focus of the vast majority of the discovery in this case, most notably during the testimony of Chief Scarpelli, who was the Village's designated Rule 30(b)(6) representative (DSOF ¶ 7 n.1). During his deposition, Scarpelli testified that all types of leave are supposed to be treated the same with respect to scheduling RDOs (PSOF, ¶ 34), but also that military leave is the only type of leave that is required to be scheduled using RDOs (PSOF, ¶ 33). Had Defendants produced Exhibit 35 during discovery, then Plaintiff's counsel could have questioned Scarpelli about the specific examples that Defendants now contend are comparative scheduling situations. Moreover, had Crasovan

---

included in the interrogatories served on each of the other defendants, and each defendant answered the interrogatory in the same manner. The same is true of Request to Produce No. 4.

been disclosed as a witness, Plaintiff's counsel could have deposed her regarding the reasons for listing these situations as comparatives in the exhibit but excluding others. *See* 31 Fed. Prac. & Proc. Evid. § 8045 (1st ed.) ("[W]ithout notice identifying the source materials, adverse parties cannot know what materials in an otherwise undifferentiated mass of documents to examine. . . .Thus, in many instances the source materials *and the summaries* will be provided to the parties opposing summary evidence as part of pretrial discovery." (Emphasis added.)).

Courts routinely sanction attempts by a party to hide evidence until summary judgment. *Cf., e.g., Dry Dock, LLC v. Godfrey Conveyor Co.*, 717 F. Supp. 2d 825, 828-29 (W.D. Wisc. June 7, 2010) (declining, pursuant to Rule 37(c)(1), to consider documents and affidavits that were not produced until summary judgment); *see also Cambridge Electronics Corp. v. MGA Electronics, Inc.*, 227 F.R.D. 313, 321-25 (C.D. Cal. June 22, 2004) (same). Because Defendants failed identify Crasovan as a witness and did not produce Exhibit 35 during discovery, Rule 37(c) mandates that the evidence be excluded. Additionally, if Defendants attempt to rely on the same exhibits in their response to Plaintiff's previously filed motion for summary judgment (Dkts. 78-80), they must also be excluded. *Cf. Cambridge*, 227 F.R.D. at 324 (noting that "[l]earning of plaintiff's liability theories only after they had filed their motion for summary judgment placed defendants at a distinct disadvantage and constituted unfair surprise," and granting summary judgment after excluding the improperly withheld evidence).

## II. Defendants Are Not Entitled to Summary Judgment on Plaintiff's USERRA Discrimination Claim.

One of the primary purposes of USERRA is to "to prohibit discrimination against persons because of their service in the uniformed services." 38 U.S.C. § 4301(a)(3). Claims under USERRA's antidiscrimination provision (38 U.S.C. § 4311(a)) are analyzed under a burden-shifting framework, in which a plaintiff "bears the initial burden of showing by a preponderance

of the evidence that his military service was a substantial or motivating factor in the adverse employment action. If the employee makes that prima facie showing, the employer can avoid liability by demonstrating, as an affirmative defense, that it would have taken the same action without regard to the employee's military service." *Montoya v. Orange County Sheriff's Dep't*, 987 F. Supp. 2d 981, 1009 (C.D. Cal. 2013) (citations omitted); *see also* 38 U.S.C. § 4311(c)(1).

Defendants do not discuss either element of Plaintiff's prima facie case in their argument. Defs.' Br. at 5-10. Instead, Defendants focus solely on the statutory affirmative defense, arguing that Plaintiff has received the same benefits in terms of scheduling RDOs as other police officers. *See* Defs.' Br. at 7-10. Defendants' argument is that "*no* Patrol Officers are allowed to self-schedule work days on dates they know they will be unavailable to work." Defs.' Br. at 7. That is, "Plaintiff is treated the same as every other Patrol Officer in the sense of prohibiting the scheduling of work days on dates that the officer knows that he or she will be unavailable to work." Defs.' Br. at 8.

Leaving aside the fact that Defendants' argument relies on exhibits that were not produced in discovery (*supra* Part I), the problem is that the argument misstates the nature of the scheduling policy. The basis of the discrimination claim is that the Village maintains an official policy that constrains military service members' RDO requests but does not do the same for nonmilitary employees. The record demonstrates that, since June 2013, the Village has denied Plaintiff's requests to use military leave to attend his monthly military obligations and instead requires him to *always* use RDOs in order to attend monthly military drill. In contrast, there is no evidence in the record that there is a similar policy in place for officers who request jury-duty leave, FMLA, bereavement leave, emergency leave, or any of the other numerous types of leave that Village police officers are entitled to under the Village's employment policies and the Collective

Bargaining Agreement. If the Village's policy were nondiscriminatory, then the Village should be able to easily identify evidence in the record that *every* police officer must *always* use RDOs whenever they are unable to work due to short-term obligations such as jury duty, a medical issue, or a death in the family.

That is not, however, what discovery in this case has shown. Chief Scarpelli, the Village's Rule 30(b)(6) designee (DSOF ¶ 7 n.1), conceded that a request for military leave for monthly drill is the only type of leave that must be scheduled using RDOs. PSOF ¶ 33. Furthermore, while the Village cites to several situations in the record that purportedly show an officer's request for a particular kind of leave was denied and the officer was required to use an RDO to cover the obligation (*but see* Pl.'s Resp. DSOF ¶ 29), these are at most only isolated instances, thus proving Plaintiff's point that requests for military leave for monthly drill are treated differently as a matter of policy than comparable nonmilitary requests. If the Village's policy toward requests for military leave for monthly drill in fact applied to all types of leave of similar length (*i.e.*, less than seven days), then there should not be any examples in the record of an officer receiving nine RDOs in a given month in addition to leave of any kind after June 2013, which is when the Village imposed its policy on Plaintiff (PSOF ¶ 32). The record, however, contains clear evidence of several such situations since that date. PASOF ¶ 4.

Conversely, if the Village maintained a general, nondiscriminatory policy that required officers to use RDOs in lieu of being granted leave only if staffing needs so required, then the record would be expected to show that Plaintiff's requests for military leave in addition to nine RDOs would sometimes be granted. This is not the case. (PSOF ¶¶ 35-36. Moreover, Chief Scarpelli conceded that the Village's stance regarding Plaintiff's requests is not actually based on staffing needs. (PSOF ¶ 41. Instead, the record shows that since June 2013, Plaintiff's requests

for military leave for monthly drill have been categorically denied and he is instead forced to use RDOs to cover the entire drill period (PSOF ¶¶ 35-36), while Defendants can point only to evidence that shows vacation requests by other officers have only occasionally been required to be covered by RDOs, and even then at most only partially. *See* Pl.'s Resp. DSOF ¶ 29. Under these circumstances, Defendants have not and cannot show that Plaintiff was treated the same as other nonmilitary officers.

Defendants' argument also suffers from three significant logical flaws. First, the Village rationalizes its discriminatory treatment of Plaintiff by claiming that officers cannot "self-schedule work days on dates they know they will be unavailable to work." Defs.' Br. at 7. This statement makes little sense, given that Plaintiff is not asking the Village to schedule him for a work shift that he knows he will be unable to attend. Instead, Plaintiff notifies the Village of his monthly military obligations and requests military leave in order to attend drill, as he is entitled to do under the Village's employment policies. PSOF ¶¶ 15, 20. While Defendants willfully mischaracterize Plaintiff's leave requests as "self-scheduling work days on dates that he knows he will be unable to work because of his military commitments" (Defs.' Br. at 7), Defendants do not explain how a request for military leave to attend monthly drill differs from a similar request by another officer for jury-duty leave, bereavement leave, or any other kind of leave that officers are entitled to. If this argument were correct, then no officer would ever be entitled to any type of leave because the officer "knows that they will be unavailable to work" on those dates. Defs.' Br. at 7. That is clearly not the case. PASOF ¶ 4; PSOF ¶¶ 15-17, 19.

Second, Defendants acknowledge that Plaintiff is required to use RDOs to cover his military drills each month but assert that this is not discriminatory because Plaintiff is still scheduled for nine RDOs each month. Leaving aside the problem that Plaintiff's requests for military leave are

categorically denied while comparable leave requests of similar length by other officers are not, Defendants justify the argument by analogizing to employers who maintain normal Monday-through-Friday workweeks. Defs.' Br. at 9. This is a false analogy, however, because of the unique manner in which the Village schedules police officers to work each month. In a putative workplace that uses a normal Monday-to-Friday schedule, each employee would always have the same days off as any other employee in a given month. In such a hypothetical situation, the employer's denial of a military member's request for additional or different days off during the work week to compensate for Saturdays and Sundays spent at drill would not necessarily be discriminatory under USERRA because the employee would be viewed as seeking an additional benefit that other employees do not have. That is essentially the situation that the Seventh Circuit found to be nondiscriminatory in *Crews v. City of Mt. Vernon*, 567 F.3d 860, 865 (7th Cir. 2009), and it is also essentially the situation with respect Federal employees. *See* Defs.' Br. at 9 n.1 (citing *Butterbaugh v. Department of Justice*, 336 F.3d 1332, 1337 (Fed. Cir. 2003)).

Yet that is not the situation here because of the Village's unique method of scheduling police officers for work. Rather than maintaining a set schedule with specific days off set well in advance, such as Mondays through Fridays with weekends off, the Village allows its officers to request particular RDOs every month and then creates the schedule based on those requests, and the schedule changes from month to month. The problem here is that the Village deliberately, and as a matter of official policy, manipulates Plaintiff's schedule each and every month in order to ensure that he is *always* required to use RDOs to cover his monthly military drill obligations. The Village does not impose the same requirement as a matter of policy on any leave request other than military leave for monthly drill, instead allowing other officers to select their RDOs without regard to any comparable pending leave requests. It is this intentional and discriminatory

12

manipulation of Plaintiff's schedule that distinguishes this case from situations such as *Crews* and the Monday-to-Friday analogy advanced by Defendants. *Cf.* Dkt. 29, at 7-9.

Third, in their discussion of *Crews*, Defendants offer a classic straw-man fallacy.[3] Defendants assert that the Village's system is nondiscriminatory because "the Village allows *all* employees to have their unpaid RDOs scheduled to accommodate their inability to work. . . . [T]he Village here permits *all* employees to request to have their days off scheduled to coincide with outside activities and indeed schedules RDOs to coincide with outside activities." Defs.' Br. at 9. The issue in this case is not, however, that Plaintiff has been requesting RDOs that coincide with drill and the Village has declined to accommodate the request. It is instead the exact opposite problem: the Village *forces* Plaintiff to schedule RDOs that coincide with his monthly military drill obligations rather than granting him military leave for drill, while it does not impose that same requirement on other officers who request leave for nonmilitary obligations.

Finally, Defendants rely on *Pignato v. American Trans Air, Inc.*, 14 F.3d 342 (7th Cir. 1994), to support their argument. *See* Defs.' Br. at 10. *Pignato*, however, is procedurally inapposite because the decision was issued following a bench trial on the merits (*id.* at 346), but this case is only at the summary judgment stage. More importantly, the Seventh Circuit's rationale in affirming the district court's verdict in *Pignato* was identical to the rationale of *Crews*. The Seventh Circuit affirmed the verdict because the evidence showed only that the plaintiff "was seeking a 'special work scheduling preference,'" and the statute "did not impos[e] an obligation on employers to provide a special work scheduling preference for reservists. Rather, the legislation stated explicitly that reservists were to be entitled to the same treatment afforded their

---

[3] The argument also contains the irrelevant and factually unsupported assertion that "Plaintiff and other reservists, however, enjoy the extra benefit of 'super priority' in receiving their preferred day off requests for purposes of ensuring they are available to attend monthly drills." Defs.' Br. at 9; *see* Pl.'s Response to DSOF, ¶ 35.

co-workers not having such military obligations." *Id.* at 350 (internal quotation marks omitted); *cf. Crews*, 567 F.3d at 865 (citing *Pignato*). As discussed above, the evidence in the record shows that Plaintiff is not requesting a special benefit that is unavailable to his non-military colleagues, but is instead simply asking that his requests for military leave for monthly drill be treated the same as a request for any other comparable leave request with respect to scheduling RDOs. *Pignato*, like *Crews*, is therefore distinguishable.

In light of the above points, Defendants have not demonstrated that the record indisputably shows that Plaintiff is treated the same as other officers with respect to leave and RDOs, and so their motion for summary judgment on the USERRA discrimination claim should be denied.

## III. Disputed Issues of Material Fact Preclude Summary Judgment on Plaintiff's USERRA Retaliation Claim

USERRA's anti-retaliation provision is contained in section 4311(b) and, similarly to USERRRA's anti-discrimination provision, states that if a plaintiff demonstrates that a protected activity "is a motivating factor in the employer's action," then the employer is liable under USERRA "unless the employer can prove that the action would have been taken in the absence of such person's" protected activities. 38 U.S.C. § 4311(b), (c)(2).

### A. Defendants' Actions Against Plaintiff Were Materially Adverse

Defendants first argue that there is no evidence that any of the actions taken against Plaintiff by the Village constituted "adverse action" under USERRA. *See* Defs.' Br. at 11. In order to be adverse within the meaning of the statute, "[a]n adverse employment action must be materially adverse, not merely an inconvenience or a change in job responsibilities." *Crews*, 567 F.3d at 869; *see also Gross v. PPG Industries, Inc.*, 636 F.3d 884, 892 (7th Cir. 2011) (same). This standard is generally satisfied by actions such as "termination, demotion accompanied by a decrease in pay, or a material loss of benefits or responsibilities." *Crews*, 567 F.3d at 869.

14

However, the materiality requirement is based on the U.S. Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), which established the standard for a retaliation claim under Title VII. *See id.* Notably, the Supreme Court stated that the term "materially adverse" means only that a plaintiff must show that the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (internal quotation marks omitted); *see also Nair v. Nicholson*, 464 F.3d 766, 768-69 (7th Cir. 2006). The Court also noted that it chose to "phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Burlington*, 548 U.S. at 69; *see also id.* (noting that "an act that would be immaterial in some situations is material in others" (internal quotation marks omitted)).

Defendants concede that Plaintiff's suspension was materially adverse (*see* Defs.' Br. at 12), so the adverse-action element is clearly satisfied in this case. Even so, there is no need to consider whether a hypothetical employee might be deterred from complaining because the record contains direct evidence that an employee was in fact deterred. Officer Patrick Howe, a Village police officer and former Marine reservist, was also subjected to the Village's scheduling policy. PASOF ¶ 39. Although Officer Howe was so adversely affected by the policy that he eventually resigned from the reserve, Officer Howe was deterred from submitting a complaint because he witnessed how the Village treated Plaintiff after he complained. PASOF ¶ 39.

Furthermore, to the extent that Defendants argue that Plaintiff did not lose any pay or benefits while he was on administrative leave or desk duty, or due to his mandatory referral to EAP and a fitness-for-duty evaluation (Defs.' Br. at 12), that is not the standard that *Burlington* established. It is certainly true that loss of pay or benefits is a useful rule of thumb for

determining whether a particular employment action is sufficiently adverse to support a retaliation claim, as noted in some of the cases cited by Defendants. *See* Defs.' Br. at 12-13 (citing *Clegg v. Arkansas Department of Corrections*, 496 F.3d 922 (8th Cir. 2007), *Duncan v. U.S. Postal Service*, 168 F.3d 1322 (Fed. Cir. 1998), and *Peltier v. United States*, 388 F.3d 984 (6th Cir. 2004)). However, *Duncan* and *Peltier* were decided before *Burlington* and therefore do not employ the modern *Burlington* standard in their analysis. Additionally, each of the cases cited by Defendants is distinguishable because there was no direct evidence in those cases that any other employees had been deterred by the adverse action from complaining.

For example, in *Clegg* the Eighth Circuit affirmed summary judgment in the defendants' favor because "[the plaintiff] has failed to demonstrate that a reasonable worker would have been dissuaded from engaging in protected activity based upon her allegations of retaliatory behavior." *Clegg*, 496 F.3d at 929-30. Similarly, in *Duncan*, which was a nonprecedential unpublished opinion, the Federal Circuit simply held with little to no analysis that the plaintiff's placement on paid leave pending a fitness-for-duty evaluation did not constitute an actionable adverse action for the purpose of establishing jurisdiction under the federal Merit Systems Protection Board. *See Duncan*, 168 F.3d 1322, at *1-3. The case was decided nearly a decade before *Burlington* and did not in any way involve a claim of retaliation, so the case has little if any precedential value here. Finally, while the issue before the Sixth Circuit in *Peltier* did deal with a Title VII retaliation claim, the case was decided two years before the Supreme Court's decision in *Burlington*. Notably, *Burlington* resolved a circuit split regarding how harmful an adverse employment action must be in order to be actionable under Title VII's anti-retaliation provision. *See Burlington*, 548 U.S. at 60. The Supreme Court ultimately rejected the restrictive interpretation used by the Sixth Circuit in favor of the more flexible approach used by the

16

Seventh and D.C. Circuits. *See id.* at 67-68. The standard used by the Sixth Circuit two years earlier in *Peltier* is thus incorrect, and therefore the result in *Peltier* does not provide any guidance here. *Cf. Covert v. Monroe County Dept. of Job & Family Svcs.*, 2010 WL 2346550, at *8 n.12 (S.D. Ohio June 8, 2010) (noting that *Peltier* was decided before *Burlington* and that *Burlington*'s "more liberal definition permits actions not adverse for purposes of an anti-discrimination claim to qualify as such in the retaliation context").

Instead, the question is simply whether Defendants' actions against Plaintiff "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68. The record contains direct evidence that Defendants' actions did so, and therefore Plaintiff has established that the actions were materially adverse. Moreover, even in the absence of this evidence, there is sufficient evidence in the record to support a finding of materiality. In *Michael v. Caterpillar Financial Services Corp.*, 496 F.3d 584, 596 (6th Cir. 2007), the Sixth Circuit applied the *Burlington* standard and found that a placement of the plaintiff on paid administrative leave followed by a mandatory 90-day performance plan was sufficient to satisfy *Burlington*'s "relatively low bar" for material adversity. The plaintiff had been allowed to stay in her job position but only on the condition that she participate in a 90-day performance plan that required weekly meetings and other requirements. *See id.* at 591-92. Similarly to *Michael*, the Village ordered Plaintiff to participate in EAP sessions, a fitness-for-duty evaluation, and six additional counseling sessions. As in *Michael*, the stringent obligations that the Village subjected Plaintiff to were sufficiently severe to constitute materially adverse employment actions, even without the direct evidence that Officer Howe was in fact deterred from complaining due to the Village's actions against Plaintiff.

17

**B. The Evidence Establishes Causation Under the "Convincing Mosaic" Approach**

Defendants next separately argue that there is no evidence in the record to support either causation or pretext (Defs.' Br. at 14-18), but the two issues must be analyzed together. As the Seventh Circuit summarized in *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012), retaliation claims may be proven by either direct or indirect evidence. The indirect method of proving causation, which is the method used in most cases, is based on "three categories of circumstantial evidence available to a plaintiff using the 'convincing mosaic' approach." *Id.*

> One includes suspicious timing, ambiguous statements oral or written, . . . and other bits and pieces from which an inference of [retaliatory] intent might be drawn. Another is evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently. Another type is evidence that the employer offered a pretextual reason for an adverse employment action. Each type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together.

*Id.* (citations and internal quotation marks omitted). As discussed below, the record here contains evidence of each of the three types of circumstantial evidence, which is more than enough to preclude summary judgment.

*1. Suspicious Timing*

While "temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter, . . . [w]hen temporal proximity is one among several tiles in an evidentiary mosaic depicting retaliatory motive, however, [s]uspicious timing . . . can sometimes raise an inference of a causal connection." *Id.* (internal quotation marks omitted). There is no "bright-line numeric rule" regarding suspicious timing, and "[d]eciding when the inference is appropriate cannot be resolved by a legal rule; the answer depends on context. . . . A jury, not a judge, should decide whether the inference is appropriate." *Id.* at 861 (internal quotation marks omitted).

Defendants make much of the purported year-long gap between Plaintiff's initial complaint in September 2012 and the retaliatory actions that began in September 2013, but Defendants omit a number of significant events from their timeline. While Plaintiff initially complained about the Village's scheduling practice in September 2012, the Village then sat on Plaintiff's complaint for ten months until May 2013, when Lopez informed Plaintiff of the policy change. Pl.'s Resp. DSOF ¶ 82. It was not until April 2013 that the Village first denied Officer Howe's request for military leave for the following month (PASOF ¶ 3), and it was not until May 17, 2013, that Lopez informed Plaintiff that, starting June 2013, the Village would henceforth require Plaintiff to use RDOs to cover his monthly military obligations instead of being granted leave (PSOF ¶ 32). Plaintiff then filed his formal grievance over the matter on May 21, 2013 (Pl.'s Resp. DSOF ¶ 83), and on June 13, 2013, he informed the Village that he intended to file a lawsuit over the matter (PASOF ¶ 15). When these events are considered, the timing interval is reduced to a mere three months.

Yet the most noteworthy timing evidence is the fact that Commander Krupnik, the same person who originally took issue with Plaintiff's military-leave requests, rotated back into command of Plaintiff's watch in September 2013. PASOF ¶ 16. Within mere weeks of Krupnik's return to the watch, Krupnik suddenly took issue with Plaintiff's habit of responding with "kill" during roll call, despite the fact that Plaintiff had been responding in that manner since he first joined the department and it had never before been a problem before. PASOF ¶¶ 9-10.

This chain of events demonstrates that the Village's retaliatory actions began less that four months after Plaintiff was informed of the Village's intent to institute the scheduling policy, about three months after Plaintiff informed the Village that he intended to file a lawsuit, and only a few short weeks after Krupnik resumed command of Plaintiff's watch. Under these

circumstances, a jury could reasonably infer that the timing was suspicious and therefore that the subsequent actions against Plaintiff were in fact retaliatory.

### 2. Pretext

Defendants argue that Plaintiff was properly disciplined for disobeying Krupnik's order and was properly sent to EAP, for a fitness-for-duty evaluation, and for counseling based on the content of his memorandum and the recommendations of the various providers. *See* Defs.' Br. at 16-18. In order to show that these reasons are pretextual, Plaintiff "must present evidence suggesting that the employer is dissembling," which includes "such weaknesses, implausibilities, inconsistencies, or contradictions" in the asserted reason "that a reasonable person could find [it] unworthy of credence." *Coleman*, 667 F.3d at 852-53.

The problems with Defendants' asserted rationales for their decisions begin with Plaintiff's use of the word "kill" during roll call. The entire time that he had been employed by the Village, which by September 2013 was over seven years, Plaintiff had almost invariably been responding with the term when his name was called during roll call, on many occasions when supervisors up to and including the chief of police were present. PASOF ¶¶ 9-10, 12 Indeed, Krupnik had previously been Plaintiff's commander for four months in 2012, and he claimed that he attended roll call almost every day that he worked. PASOF ¶ 17. And yet in September 2013, not long after making it known that he intended to sue the Village, Plaintiff's habit of responding in this way suddenly became an issue for the very first time. While Krupnik claimed that he took action because he learned that unnamed officers were allegedly offended, Krupnik is unable to identify these alleged officers or even verify that they existed and were in fact offended. PASOF ¶ 19. Moreover, when Plaintiff asked Krupnik why the issue had suddenly come up, Krupnik lied and told Plaintiff that Krupnik himself was the one offended, even though he in fact believed that it

was "not a big deal." PASOF ¶ 18. A jury could easily infer from these facts that the alleged "other officers" did not actually exist. This calls Krupnik's stated rationale into doubt, particularly in light of the extreme unlikelihood that Krupnik was unaware that Plaintiff habitually responded with "kill" during roll call when Plaintiff had been doing so for years and Krupnik claimed to be attending roll call daily.

Krupnik's admission that he told Plaintiff that he was the only one offended also calls into doubt the rationale for the decision to suspend Plaintiff for the alleged insubordination. Plaintiff understood Krupnik's order to mean only that he should not respond with "kill" in Krupnik's presence, and Plaintiff explained his understanding of the order in his memorandum. PASOF ¶¶ 20, 22. When it is evident that there was a misunderstanding, the police department's own general orders state that an informal counseling is sufficient to remedy the problem. PASOF ¶ 24. Yet Krupnik instead recommended a two-day unpaid suspension, and Lopez ultimately imposed a one-day unpaid suspension. Pl.'s Resp. DSOF ¶ 108; PASOF ¶ 25. Additionally, the decision to impose a suspension was purportedly based on Plaintiff's previous disciplinary "history," yet not only did Krupnik have no personal knowledge of any such discipline (*see* Pl.'s Resp. DSOF, ¶ 107), Plaintiff's disciplinary file contained no sustained discipline prior to September 2013 (PASOF ¶ 23) and he had received an overall "exceeds expectations" rating from then-Sergeant Libit on his 2010 annual evaluation (PASOF ¶ 6), which was written only a few weeks after the alleged discipline. Further, the "investigation" into Plaintiff's insubordination was highly irregular. Brian Baker was the acting director of internal affairs at the time and was responsible for all formal internal affairs investigations (PASOF ¶ 31), yet the investigation was inexplicably conducted by Krupnik, who was himself the complainant and thus had a conflict of interest in the outcome of the investigation.

The decision to subject Plaintiff to a mandatory EAP referral was also badly flawed. While Defendants claim that they did so pursuant to the EAP policy, Lopez admitted that he failed to follow the department's guidelines and instead relied only on "Christa Ballowe's guidelines." Pl.'s Resp. DSOF, ¶ 98. Additionally, despite claiming that the content of Plaintiff's memorandum "alarmed" them, neither Lopez nor Scarpelli ever talked to Plaintiff about the content of the memorandum or asked him what he meant. PASOF ¶ 38. Furthermore, the alleged purpose of referring Plaintiff to ComPsych was to determine whether Plaintiff was a threat to himself or others (PASOF ¶ 32), but ComPsych informed the Village that Plaintiff was not on October 3, 2013 (PASOF ¶ 33). If the Village had truly been concerned only about whether Plaintiff was a threat, then he would have been returned to duty at that point. Yet Ballowe instead made the unusual demand that ComPsych perform a fitness-for-duty evaluation, despite being informed that ComPsych does not do such evaluations or provide recommendations that employees undergo them. PASOF ¶ 34-35. Indeed, Jeffrey Giraldo, the EAP provider who conducted the EAP sessions, declined to write a recommendation that Plaintiff participate in a fitness for duty evaluation, stating that the fitness for duty "decision is strictly employer's choice." PASOF ¶ 36. Yet the Village then forced Plaintiff to undergo a fitness-for-duty evaluation anyway, claiming that it was because of ComPsych's recommendation.

The pattern persisted even through the fitness-for-duty process. After Dr. O'Grady expressly found that Plaintiff was fit for duty, he suggested that Plaintiff would benefit from a series of personal counseling sessions but emphasized that the Village could return Plaintiff to duty at any time. Pl.'s Resp. DSOF ¶ 102. The Village, however, kept Plaintiff on desk duty until November 26, 2013, nearly two months after he had first been sent to ComPsych, even though it had long since confirmed that he was not a threat and was fit for duty. PASOF ¶¶ 33, 39; Pl.'s Resp.

DSOF ¶ 102.

There is thus ample evidence in the record from which a reasonable jury could infer that the Village's various claimed rationales for their actions against Plaintiff were pretextual fabrications.

### 3. *Similarly Situated Employees*

Finally, "evidence of selective enforcement of a rule calls into question the veracity of the employer's explanation." *Coleman*, 667 F.3d at 857. "[T]he similarly-situated inquiry and the pretext inquiry are not hermetically sealed off from one another," and the two "often overlap." *Id.* at 858.

The record contains several comparators for each action that Defendants took against Plaintiff. First, the evidence shows that, like Plaintiff, Officer Mynor Chang also often responded to his name being called during roll call with "kill." PASOF ¶ 11. Unlike Plaintiff, however, Chang was never told to stop by supervisor. PASOF ¶ 26. More importantly, Chang continued responding with "kill" during roll call *after* Plaintiff got in trouble for doing so, yet he was never reprimanded much less suspended as Plaintiff was. PASOF ¶ 11.

With respect to Plaintiff's mandatory referral to EAP,



Finally, the Village's decision to subject Plaintiff to EAP and a fitness-for-duty evaluation is noteworthy in comparison to the utter lack of comparable action with respect to Officer Michael Hart. Officer Hart was accused of severely injuring an arrestee in the police department lockup. PASOF ¶ 30. Despite being accused of actually injuring someone, however, Hart was neither mandated to EAP nor sent for a fitness-for-duty evaluation. PASOF ¶ 30. In contrast, Plaintiff simply submitted a memorandum explaining why he said a single word during roll call and yet was forced to undergo both a mandatory EAP referral and a fitness-for-duty evaluation. The

disparity between the Village's treatment of Plaintiff and Hart is particularly stark in light of the Village's insistence that it "is not required to blindly ignore Plaintiff's mental state and risk becoming the next 'Ferguson' because any one of its officers is too eager to 'kill' when he hits the streets of Skokie." Defs.' Br. at 18.[4] If the Village truly took such a risk seriously, then Hart would have been sent to EAP and a fitness-for-duty evaluation after allegedly assaulting a detainee, yet he was not.

## IV. The Individual Defendants Are Liable Under USERRA

Defendants next argue that the individual defendants cannot be liable under USERRA because there is no evidence of intentional discrimination or wrongdoing. *See* Defs.' Br. at 18. Plaintiff addressed this issue as well as the question of "motivating factor" in his own motion for summary judgment (Dkt. 79, at 6, 8-9), and so he will add only three short points here.

First, Defendants assert that Plaintiff must show that "discriminatory animus was a substantial or motivating factor in the denial of an employment benefit." Defs.' Br. at 18-19. This is a misstatement of the standard, however, since USERRA requires only that Plaintiff show that his military status or protected activities were a motivating factor in Defendants' actions. *See* 38 U.S.C. § 4311(a), (b). Defendants, not Plaintiff, must prove that the actions would have been taken anyway. 38 U.S.C. § 4311(c). The statement also conflates the motivating-factor element with the causation element, which as discussed above can be proven circumstantially.

Second, Defendants argue that even if Plaintiff succeeds on the merits of his claims, there is no available remedy against the individuals. That is hardly true. Aside from a nominal finding of liability, the Court can require the individual defendants to comply with USERRA and enjoin

---

[4] The reference to Ferguson in this context is also misplaced, given that the officer involved in that incident was exonerated. *See, e.g.*, Erik Eckholm & Matt Apuzzo, *Darren Wilson Is Cleared of Rights Violation in Ferguson Shooting*, N.Y. TIMES, Mar. 4, 2015.

any future violations and punish contempt, and of course the Court can award attorney fees and expenses, for which the individual defendants would be jointly and severally liable along with the Village. *See* 38 U.S.C. § 4323(e), (h)(2).

Third, Defendants appear to assert some form of mistake-of-law defense. *See* Defs.' Br. at 20-21. A mistake regarding the law is not a defense to a USERRA violation. *See Ashman v. Winnebago County Sheriff's Dept.*, 2015 WL 641784, at *6 (N.D. Ill. Feb 13, 2015). As the court noted in *Ashman*, this "comports with the 'common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally. Our law is therefore no stranger to the possibility that an act may be intentional for purposes of civil liability, even if the actor lacked actual knowledge that her conduct violated the law.'" *Id.* (quoting *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA,* 559 U.S. 573, 583 (2010)).

## V.  The Tort Immunity Act Does Not Apply to Plaintiff's IWPA Retaliation Claim

Defendants next argue that they are entitled to summary judgment on Plaintiff's Illinois Whistleblower Protection Act (IWPA) claim (Count IV), but two of their three arguments on this issue simply reiterate points made elsewhere. *See* Defs.' Br., pt. IV(A), (C). Consequently, to the extent Defendants simply refer the Court to their argument that Plaintiff has not suffered any retaliation under USERRA (*see* Defs. Br. at 21), Plaintiff incorporates his response to that argument in Part III above. Additionally, to the extent Defendants ask the Court to revisit the question of whether the IWPA allows liability against individuals (*see* Defs.' Br. at 25), the Court definitively ruled on that issue in its memorandum order on Defendants' motion to dismiss. *See* Dkt. 29, at 18. That decision is the law of the case, and Defendants have not offered any compelling basis for reconsidering or modifying that determination. *See Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007) ("[T]he law of the case doctrine embodies the notion

that a court ought not to re-visit an earlier ruling in a case absent a compelling reason, such as manifest error or a change in the law, that warrants re-examination.").

The only new argument that Defendants raise is immunity under section 2-201 of the Tort Immunity Act (745 ILCS 10/2-201). Section 2-201 grants immunity to governmental officials who "serv[e] in a position involving the determination of policy or the exercise of discretion" from injuries that result from "act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201. In order to be entitled to immunity, however, the act or omission must "be both a determination of policy *and* an exercise of discretion." *Harrison v. Hardin County Community Unit School Dist. No. 1*, 197 Ill. 2d 466 (2001) (emphasis added). Thus, even where a particular act was discretionary, the official is entitled to immunity under section 2-201 only if the act also involved a policy decision, which is one "that require[s] the governmental entity or employee to balance competing interests and to make a judgment call as to what solutions will best serve each of those interests." *Id.*

Even assuming for the sake of argument that the individual defendants held positions involving the exercise of discretion, there is no evidence that their decisions with respect to the retaliatory actions taken against Plaintiff were policy decisions. Even if those decisions involved some measure of discretion by each individual defendant, an act of retaliation is not a policy decision. In *Weiler v. Village of Oak Lawn*, __ F. Supp. 3d __, 2015 WL 1538498, at *6-7 (N.D. Ill. Mar. 31, 2015), the court examined the interaction between section 2-201 and the IWPA. Relying on the Seventh Circuit's decision in *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 679 (7th Cir. 2009), which reversed summary judgment in favor of a municipality on the basis of section 2-201 immunity against a common-law retaliatory discharge claim, the court determined that section 2-201 did not apply to a claim of retaliation under the IWPA. The court

27

noted that a "one-time decision to fire one employee . . . does not amount to a 'judgment call between competing interests.' In fact, we are at a loss to identify any competing interests at all." *Id.* at \*7.

The situation is the same here. While Defendants' argument identifies several potentially discretionary decisions that they made in deciding to take action against Plaintiff, they have not and cannot identify any legitimate competing interests that they weighed in coming to those decisions. Instead, they simply made a related series of isolated decisions regarding a single employee, which as in *Weiler* and *Valentino* do not amount to a judgment call between competing interests. The Court should therefore deny Defendants' motion for summary judgment on the IWPA claim based on section 2-201 immunity.

## VI. Defendants Are Not Entitled to Summary Judgment on Plaintiff's IMLOAA Claim

Plaintiff addressed the merits of his IMLOAA claim (Count IV) in his motion for summary judgment (Dkt. 79, at 9-15), so he will respond here only to points not previously addressed.

Defendants first argue that the Court should "show deference" to the IDHR's dismissal of Plaintiff's IMLOAA charge. Defs.' Br. at 26. While it is true that an administrative agency's interpretation of a statute is accorded "some deference" if it is charged with administering that statute (*Medina v. Board of Education of City of Chicago*, 2014 IL App (1st) 130588, ¶ 17), such deference is inappropriate here given the lack of legal analysis contained in the IDHR's dismissal order. Moreover, the IDHR is not the body charged with administering the Illinois Human Rights Act. That authority is instead held by the Illinois Human Rights Commission, which is the agency that has the power to issue opinions. *Compare* 775 ILCS 5/8-102(G), (J), *with* 775 ILCS 5/7-101 (IDHR); *see also Wanless v. Illinois Human Rights Comm'n*, 296 Ill. App. 3d 401, 403 (1998) (noting that the "Commission's interpretation" of a statute is accorded substantial

28

weight). Regardless, even if the dismissal order had been issued by the Commission rather than the IDHR, "[w]here the Commission construes a statute, a reviewing court is not bound by the Commission's legal conclusion and reviews the decision *de novo*." *Wanless*, 296 Ill. App. 3d at 403. This is especially true here because the issue is one of first impression (*see* Dkt. 79, at 10), and so the Court should review it independently in the same manner as any other novel legal issue. *See Carter Coal Co. v. Human Rights Commission*, 261 Ill. App. 3d 1, 5-6 (1994).

Defendants next argue that the Tort Immunity Act shields them from liability under IMLOAA. *See* Defs.' Br. at 28. However, Defendants' argument is unclear and does not identify the specific provision of the Act that they claim immunity under, and so the issue should be deemed waived. Even if it is not waived, it appears from their citation to *Wieler* that Defendants assert immunity under section 2-201. This point is irrelevant, however, because section 2-201 extends immunity only to public employees, not the employer itself, and Plaintiff's IMLOAA claim is alleged only against the Village. *See also Weiler*, 2015 WL 1538498, at *6 n.5.

Finally, Defendants argue that the Collective Bargaining Agreement preempts Plaintiff's IMLOAA claim pursuant to section 15(b) of the Illinois Public Labor Relations Act (5 ILCS 315/15(b)). *See* Defs.' Br. at 29. Defendants assert that the CBA's arbitration clause is the exclusive remedy for any claim that Plaintiff may have regarding his RDOs because they affect his "hours" of work. *Id.* However, section 15(b) means only that "when the Labor Act is in conflict with a specific statute or rule regarding of conditions of employment, the Labor Act's provisions control." *Decatur Police Benevolent & Protective Ass'n Labor Committee v. City of Decatur*, 2012 IL App (4th) 110764, ¶ 30. Defendants do not explain how the CBA's RDO provision is in conflict with IMLOAA, other than asserting that Plaintiff's claim involves RDOs.

Yet Plaintiff's IMLOAA claim is not about his RDOs, but is instead about his right to

military leave. The issue is simply whether the Village must place military members such as Plaintiff on a paid leave of absence status while they attend monthly drill. *See* Dkt. 79, at 9-15. The CBA's military-leave clause states that it "shall be in accordance with State and Federal law, and additional provisions as may be set forth in the Village's Personnel Manual from time to time." PSOF, ¶ 15. The Village's Personnel Manual specifically incorporates IMLOAA into its terms. *See* PSOF, ¶ 20. It is therefore impossible for the CBA to be in conflict with IMLOAA.

This provision is doubly important because it also demonstrates that Defendants' second contention regarding exhaustion of remedies is meritless. A state-law claim is preempted by a collective bargaining agreement "if resolution of the state law claim depends on interpretation of the collective bargaining agreement." *Kostecki v. Dominick's Finer Foods, Inc. of Illinois*, 361 Ill. App. 3d 362, 368 (2005). "However, reference to a collective bargaining agreement is not enough to preempt a state law claim. If the claim raises a matter that is purely a question of state law and is entirely independent of any understanding of the terms of a collective bargaining agreement, it may proceed as a state-law claim." *Id.* (internal quotation marks and citations omitted). Resolution of Plaintiff's IMLOAA claim does not require interpretation of any provisions of the CBA because the CBA's military-leave clause simply states that it shall be in accordance with state law. The issue is merely one of state law and Plaintiff was not required to exhaust his contractual remedies before bringing his IMLOAA claim before this Court.

## CONCLUSION

For the reasons stated above and in Plaintiff's memorandum in support of his motion for summary judgment (Dkt. 79), Defendants' motion for summary judgment should be denied. The Court should instead grant Plaintiff's motion for summary judgment on Counts I and IV, and set this matter for trial on Counts II and III.

Respectfully Submitted,

BALDO BELLO

*s/James G. Vanzant*

_____

Attorney for Plaintiffs

*Filed electronically on August 28, 2015*

Dana L. Kurtz, Esq. (ARDC# 6256245)
James G. Vanzant, Esq. (ARDC# 6304196)
KURTZ LAW OFFICES, LLC
32 Blaine Street
Hinsdale, Illinois 60521
Phone:  630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us
E-mail: jvanzant@kurtzlaw.us

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies and states that the attached documents were served on the designated attorneys by electronic service via the Court's ECF System on August 28, 2015.

| | |
|---|---|
| Yvette A. Heintzelman | YHeintzelman@CBSLawyers.com |
| Benjamin E. Gehrt | BGehrt@CBSLawyers.com |
| Roxana M. Crasovan | RCrasovan@CBSLawyers.com |

*s/James G. Vanzant*

_____

*Electronically filed on August 28, 2015*