**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BALDO BELLO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 14 C 1718** |
| | ) | |
| **VILLAGE OF SKOKIE, ANTHONY,** | ) | |
| **SCARPELLI, ALFREDO LOPEZ, MICHAEL** | ) | |
| **KRUPNIK, and CHRISTA BELLOWE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Baldo Bello, a police officer employed by the Village of Skokie and a staff

sergeant in the United States Marine Corps Reserve, has sued Skokie; police chief

Anthony Scarpelli; deputy chief Alfredo Lopez; commander Michael Krupnik; Christa

Ballowe, the Village's personnel director; and Albert Rigoni, the Village's manager and

chief administrative officer, who has since been dismissed.  Bello asserts claims for

discrimination and retaliation under the Uniform Services Employment and

Reemployment Rights Act (USERRA), 38 U.S.C. § 4311 (counts 1 and 2); breach of the

Illinois Whistleblower Act (IWA), 740 ILCS 174/5 (count 3); and violation of the Illinois

Military Leave of Absence Act (IMLOAA), 5 ILCS 325/1 (count 4).  Bello seeks

declaratory and injunctive relief, as well as compensatory, liquidated, and punitive

damages.

The parties have completed discovery, and both parties have now moved for

summary judgment pursuant to Federal Rule of Civil Procedure 56.  Defendants seek

summary judgment on all four counts, while Bello seeks summary judgment in his favor

on counts 1 (discrimination under USERRA) and 4 (violation of IMLOAA).  For the

reasons stated below, the Court grants summary judgment for defendants on Bello's

IMLOAA claim and for defendant Krupnik on Bello's USERRA discrimination claim but

otherwise denies the parties' motions.

## Background

The Court takes the following facts from the allegations in Bello's complaint and

the parties' submissions on the summary judgment motion.

Police officers in Skokie do not typically work regular Monday to Friday

schedules with weekends off.  Instead, they confer with department supervisors each

month to schedule their workdays and their unpaid days off.  Management ultimately

has the authority to set officers' schedules; pursuant to the collective bargaining

agreement (CBA) that governs the terms of employment for Skokie police officers, the

Village has the "exclusive right . . . to make and implement decisions with respect to the

operation and management of its operations in all respects.  Such rights include but are

not limited to the following:  . . . to schedule and assign work . . . ."  Pl.'s Ex. 5, dkt. no.

80-2, at 324**.**

The CBA provides that "an employee will normally have 9 regular days off

(RDO's [sic]) per calendar month."  *Id.* at 305.  Each month, patrol officers in Skokie

submit request slips identifying their preferred days off for the coming month.  RDO

requests are not automatically granted but instead must first be reconciled with other

officers' requests and day-to-day staffing needs.  Balancing departmental needs with

officer preferences, supervisors (sergeants and commanders) create monthly duty schedules. The department's official policy is that RDOs do not accumulate or roll over to subsequent months if officers do not use them.

The CBA also sets forth policies regarding official leaves of absence. Officers may take up to eight days of paid sick leave per year "for illness, injury, maternity, doctor's appointments, or for serious illness or injury in the employee's immediate family." *Id.* at 308. In the event of a death in the employee's immediate family, "the employee may be granted up to three (3) days leave of absence without loss of pay for the purpose of attending the funeral," which may be extended two days with the permission of the Police Chief and Village Manager. *Id.* at 310. Employees who are required to report for jury duty "shall be excused from work without loss of pay for the period of time which he is required to report or serve." *Id.* at 311. In some situations, employees may be placed on paid emergency leave status. *Id.* at 312. And, also pursuant to the CBA, "[m]ilitary leave shall be in accordance with State and Federal law, and additional provisions as may be set forth in the Village's Personnel Manual from time to time." *Id.* at 311.

The Village's personnel manual provides that full-time employees who are members of a reserve component of the United States armed services or the Illinois National Guard receive their regular compensation and continue to accrue benefits during the leave they take to attend their annual two-week training. During basic training, up to sixty days of specialized training, and "other training or duty required by the United States Armed Forces, including weekend drills to the extent such drills conflict with an employee's scheduled work duties, a full time employee who is a

member of a reserve component of the Armed Services . . . will continue to receive from the Village wages that are paid biweekly and constitute the difference between their current base pay and the base pay received from the Military including any basic family housing allowance." Defs.' Ex. 9, dkt. no. 77-10, at 4.

Bello, a reservist in the United States Marine Corps since 2001, joined the Skokie Police Department as a patrol officer in January 2006. He was reassigned to the department's Tactical Mission Team in January 2010, but he was removed from the team and returned to patrol duties in January 2011 as a member of Watch III, the group of officers who work their scheduled days from 3:00 pm to 11:00 pm. Since joining the department, Bello has been permitted to attend annual reserve training for two weeks each summer, and he was deployed to Iraq on at least one occasion from late 2007 to August 2008. He is also required to participate in training with the Marine Corps two to four days each month, which the Village has never prevented him from attending.

For the first four years of his employment, Bello always requested RDOs for his two- to four-day weekend drills, and his supervisors always ensured that he got those RDOs, even when scheduling concerns required them to deny other officers' requests for particular days off. In February 2010, however, Bello began requesting military leave for his monthly drills in addition to his nine requested RDOs each month. For over two years, Bello requested and was granted nine RDOs in addition to two to four days of military leave every month.

Things changed for Bello when Commander Michael Krupnik rotated onto Watch III. Before his four-month rotation as watch commander began in September 2012, Krupnik discussed scheduling with Bello and became concerned that Bello's schedule

4

request was noncompliant with Village and department policy. Bello told Krupnik that he understood the law to have changed in 2010 to require the department to approve his requests for military leave and nine RDOs, and he said that other watch commanders had been approving his requests since he began submitting them in early 2010. Krupnik told Bello he would look into the matter but that in the meantime, Bello's request for nine RDOs plus military leave for his monthly drill would be approved for the month of September.

Krupnik spoke with other watch commanders about RDO scheduling and consulted the personnel manual to see if its military leave provision addressed proper scheduling of RDOs. The personnel manual said nothing on the issue, so Krupnik turned to Skokie Chief of Police Anthony Scarpelli and Village Personnel Director Christa Ballowe for guidance. As police chief, Scarpelli was the ultimate decision maker with regard to the department's policies, practices, and procedures, including disciplinary actions. As personnel director, Ballowe was responsible for recommending and administering the Village's employment policies and practices. After Krupnik, Ballowe, and Scarpelli discussed the matter, Krupnik scheduled a meeting with Bello to discuss the Village's military leave and RDO policies.

On September 12, 2012, Bello met with Krupnik, Ballowe, and Alfredo Lopez, then the Deputy Chief of Police in charge of departmental operations. Krupnik, Ballowe, and Lopez informed Bello that they believed his requests for military leave in addition to and separate from his RDOs violated Village policy and that he should instead be requesting RDOs for the days he knew he would be participating in military drills. Bello disagreed, telling his superiors that he understood the law to have changed and that it

5

required the Village to grant both his requested RDOs and his requests for military leave every month. Eight days later, Bello submitted a memorandum to Ballowe reiterating this point.

Skokie decision makers continued to investigate to ensure that the Village was complying with state and federal law. Ballowe contacted legal counsel to request assistance. Meanwhile, Krupnik and Lopez contacted Employer Support of the Guard and Reserve, an office of the U.S. Department of Defense whose mission is to serve as a resource to promote understanding and cooperation between reservists and their civilian employers. Lopez shared what he learned from this call with Scarpelli and Ballowe. Krupnik also spoke with legislative liaisons about proper scheduling practices under Illinois law.

In light of all of this information, the Village and its authorized decision makers determined that USERRA and Illinois law permitted their practice of requiring officers to schedule RDOs rather than military leave for the days they knew they would need to attend monthly weekend drills. Throughout this process, Bello sent seven or eight e-mails and notices to Ballowe. Eventually, Scarpelli told Bello that Ballowe was offended by the tone of Bello's communications and requested that Bello communicate directly with him rather than continuing to communicate with Ballowe. Bello testified in his deposition that it was perfectly appropriate for Scarpelli to make this request if Ballowe was offended.

In April 2013, Officer Michael Howe requested military leave in addition to nine RDOs for the month of May, but Lopez told him that he needed to request RDOs for his military leave days instead. Howe, who was not on the police force at the time Bello

raised the issue in September 2012, claims that he did not complain about the Village's policy because he had heard that Bello had been treated badly after complaining.

In May, Bello again raised concerns about the Village's policy, this time through a formal grievance. Scarpelli and Village Manager Albert Rigoni provided written explanations for their decision to deny Bello's grievance, which proceeded through step four of the CBA's grievance procedure but did not go to arbitration. (Bello understood his union to be waiting to pursue arbitration until the conclusion of his civil suit.) In June 2013, the Village began fully enforcing its interpretation of its military leave RDO policy. Bello alleges, and defendants admit, that from June 2013 on, the Village always denied requests from reservists (including Bello) seeking leave for their military drills in addition to nine RDOs, instead directing them to schedule RDOs on the days they knew they would be attending military drills.

During daily roll call in late September 2013, Krupnik observed Bello respond when his name was called by saying, "kill." Krupnik had witnessed this before—Bello had been doing this during roll call almost every day since joining the Skokie police. Bello explained in his deposition and materials on summary judgment that U.S. Marines often use their own vernacular not used by civilians, "such as 'ink stick' instead of 'pen,' 'bulkhead' rather than 'wall,' or 'kill,' which is regularly used to express motivation, readiness, or as a greeting, or in roll-call situations to acknowledge their presence." Defs.' Resp. to Pl.'s Stat. of Add'l Facts, dkt. no. 102, ¶ 7. In his deposition, Bello testified that in his experience, Marines like himself are taught to respond "kill" in roll call as early as their first day of boot camp. Although Bello knew that some behavior that would be appropriate with the Marines would not be appropriate with the police

department, he was under the impression that this behavior was innocuous and that his colleagues found it either motivating or funny. Other officers, including Officer Mynor Chang (also a Marine), sometimes responded the same way during roll call, and for the first seven years of his employment, Bello never knew anyone to be bothered or offended by his roll call response. This time, though, Krupnik ordered Bello to cease responding "kill" in roll call. Krupnik explained his order by telling Bello that he found the response offensive. During this litigation, however, Krupnik revealed that this was not true and that he did not have any problem with Bello's behavior. In truth, Krupnik now says, he had been approached by a union representative who wanted to voice the opinions of other officers, and he lied to Bello to protect their identities.

No similar complaint was ever lodged against Chang or other officers who said "kill" in roll call, and Krupnik issued no similar order to any other officer. Krupnik did, however, inform Timothy Gramins, the sergeant on duty, that he had given Bello an order to desist from using the word "kill" in roll call, and he instructed Gramins to monitor Bello to ensure his compliance with the order. When Bello said "kill" during roll call again three days later, Krupnik was not there to hear it, but Gramins was. Gramins and another officer met with Bello and instructed him to submit a memorandum to Krupnik explaining why he had disobeyed Krupnik's order. Bello told them that it was a slip of the tongue but that he did not believe it mattered because he was under the impression that only Krupnik was offended. In the memorandum he delivered to Krupnik, Bello again stated that his insubordination was an accident. He also wrote:

> I have been using the word "kill" in roll call as a sign of readiness to and motivation to go out and do my job with a sense of heightened awareness and sense of responsibility to our citizens and my partners on the street in an implication to "kill" any form of threat to life or to kill the enabling of

great bodily harm to anyone. Putting sensibilities aside, we all as sworn officers of the law carry firearms for a single purpose. To engage any form of life threatening violence with even greater, trained and responsible violence. The training department just sent me to a training class for close quarters handgun fighting where the instructors drove home the fact that we are professional managers of violence. "We kill bad people" is what the theme of the training was and there was a very clear understanding that we as police officers might have to kill someone every day we are on the street.

. . .

It is obvious this situation is going to lead me down a path that I don't want to go, so I will stop using it, but only because the consequence and the inconvenience of having to be written up and disciplined are being presented to me as deterrents. My mental readiness and my self-motivation, not any one's feelings, are all that I care about when strapping on my uniform and all my tools as they are what will get me through a life or death incident in the event I encounter one. Perhaps a reminder to some that this bottom line still remains: wether [sic] you are a 5 ft nothing female officer, a 6' 5" male officer weighing 300 lbs, a Sergeant, Commander or Deputy Chief…YOU, yes YOU may very well have to "kill" someone in this line of work….TODAY. People don't have to like it, they just have to accept it and deal with it.

Defs.' Ex. 25, dkt. no. 77-26, at 10–11. Bello was asked if he would like to redraft the

memo, but he declined to do so.

Article X of Skokie Police Department General Order A-13.11, which pertains to

internal investigations of malfeasance, states:

If negligence or a simple misunderstanding is a factor, this should be pointed out in a constructive manner to the member/employee. Often, informal counseling is all that is required to correct the situation. If the member/employee simply misunderstood the facts, the supervisor should point this out in a counseling session conducted in a similar manner to that indicated where negligence is involved.

Pl.'s Ex. W, dkt. no. 95-23, at 12. When deputy chief Lopez received Bello's

memorandum, he did not engage in informal counseling. Rather, he recommended

referring Bello for a psychological evaluation, stating that he had "questions of grave

concern regarding Officer Bello's status given his written response to the act of insubordination" because it "call[ed] into question his abilities to function as an emotionally stable, impartial, fair police officer who accepts directions and responds to orders given by supervisory staff."  Defs.' Ex. 25, dkt. no. 77-26, at 19.  Lopez and Ballowe hoped that Employment Assistance Program (EAP) staff would conduct a safety assessment and report back on whether Bello was a threat to himself or others. Bello was placed on administrative leave while undergoing his mandatory EAP referral.

In early October, EAP counselor Jeffrey Giraldo met with Bello and evaluated him.  Giraldo reported that he was unsure Bello could effectively differentiate between his life as a Marine and his life as a police officer.  Ultimately, Bello was recommended for further counseling to focus on stress management, but he was deemed not to present a risk of harm to himself or others.  Ballowe asked EAP staff to conduct a fitness for duty (FFD) evaluation or at least make a recommendation on whether Bello should be subject to an FFD evaluation.  Ballowe was told, however, that FFD determinations are the employer's to make.  Ballowe therefore determined and instructed that Bello should submit to an FFD evaluation.

 Dr. Daniel O'Grady conducted Bello's FFD evaluation on October 11, 2013 and determined that Bello was fit only for light duty until after he completed six 45–60 minute weekly individual counseling sessions with a licensed mental health professional.  Bello was assigned to desk duty while he attended these counseling sessions, and upon completing them, he was reinstated to full duty in late November.  In the meantime, Krupnik urged Lopez to impose a two-day suspension upon Bello for his insubordinate act of disregarding Krupnik's order.  Lopez ultimately levied a one-day suspension,

effective October 19, 2013.

Bello filed this suit in March 2014, and the parties engaged in extensive motion practice and discovery. In June 2014, Bello filed a charge of discrimination with the Illinois Department of Human Rights (IDHR), asserting that the department's military leave policy violates IMLOAA. The IDHR issued a decision on March 17, 2015, dismissing Bello's charge for lack of substantial evidence. Both sides have now moved for summary judgment.

## Discussion

Summary judgment is proper when the moving party "shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court draws reasonable inferences in favor of the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). The Court's "function is not to weigh the evidence but merely to determine if there is a genuine issue for trial." *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

On cross-motions for summary judgment, the Court assesses whether each movant has satisfied the requirements of Rule 56. *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). "As with any summary judgment motion, [the Court] review[s] cross-motions for summary judgment construing all facts, and drawing all reasonable inferences from those facts, in favor of the nonmoving party." *Laskin v.*

*Siegel*, 728 F.3d 731, 734 (7th Cir. 2013) (internal quotation marks omitted).

Defendants move for summary judgment on all four of Bello's claims. First, they argue that Bello has failed to adduce evidence that would support a reasonable inference that he was discriminated against on the basis of his military status in violation of USERRA (count 1). Second, defendants seek summary judgment on Bello's retaliation claims under USERRA and IWA (counts 2 and 3), arguing that he has failed to show that his military status was a cause of materially adverse employment action or that the department's proffered reason for any such action was pretextual. Third, they seek summary judgment on Bello's IMLOAA claim (count 4) because, they argue, IMLOAA does not require an employer to do any more than what the evidence shows defendants already do to accommodate military service members who must take leaves of absence. Defendants also argue in the alternative that Scarpelli, Lopez, Krupnik, and Ballowe cannot be held individually liable on any of Bello's claims. They contend that there can be no individual liability under USERRA, largely because they do not believe any of the remedies available under USERRA can be granted against individuals in their individual capacities. Defendants further contend that the Illinois Tort Immunity Act bars Bello's state law claims against the individual defendants.

For his part, Bello seeks summary judgment in his favor on counts 1 and 4. He argues that the record evidence establishes that the Skokie police department treats military leave differently from other types of leave. He also argues that due to his military status, he was denied a benefit of employment available to other employees—namely, being permitted to schedule days of leave for which he is eligible in addition to his nine monthly RDOs. Bello also argues that by forcing him to take unpaid days off to

tend to his military responsibilities, defendants violated his rights under state law.

## A.     USERRA discrimination claim

Under USERRA, "[a] person who is a member of . . . or has an obligation to perform service in a uniformed service shall not be denied . . . any benefit of employment by an employer on the basis of that membership . . . or obligation."  38 U.S.C. § 4311(a).  The statute further provides that

> a person who is absent from a position of employment by reason of service in the uniformed services shall be . . . entitled to such other rights and benefits not determined by seniority as are generally provided by the employer of the person to employees having similar seniority, status, and pay who are on furlough or leave of absence under a contract, agreement, policy, practice, or plan in effect at the commencement of such service or established while such person performs such service.

*Id.* § 4316(b)(1)(B).  USERRA defines "employer" as "any person, institution, organization, or other entity that pays salary or wages for work performed or that has control over employment opportunities, including . . . a person, institution, organization, or other entity to whom the employer has delegated the performance of employment-related responsibilities."  *Id.* § 4303(A)(i).  If a person brings a successful action under USERRA, a court may award relief by ordering the employer to comply with the law and to compensate the person for the wages or benefits lost due to the employer's noncompliance.  *Id.* § 4323(d)(1)(A)–(B).  In the event the court determines the employer's noncompliance was willful, the court may order the employer to pay liquidated damages.  *Id.* § 4323(d)(1)(C).

Bello contends that the Village violated USERRA by depriving him a benefit offered to others and that Ballowe, Scarpelli, Krupnik, and Lopez, in their individual capacities, did so as well.  Defendants argue that there can be no individual liability

under USERRA, largely because "there is no discernable remedy that could be imposed on the individual Defendants that would make the Plaintiff whole." Defs.' Mem., dkt. no. 86-1, at 26. They also contend that all of the individual defendants' alleged acts were taken in their official capacities, not their individual capacities, and that at the very least, summary judgment on the USERRA discrimination claim should be granted in Krupnik's favor because there is no evidence that he had any decision making authority.

The Court does not agree with defendants' contention that USERRA does not contemplate individual liability. The plain text of USERRA's definition of an "employer" reflects that an individual, whether acting on his own behalf or as a delegee of decision making authority, can be held liable. There is no reason to read into the plain text of USERRA an unwritten exemption for individuals who act on behalf of an entity employer. If anything, both administrative and judicial interpretations of USERRA suggest the opposite. Interpreting USERRA, the Department of Labor expressly rejected a proposed rule excluding individual decision makers from liability:

> The [Equal Employment Advisory Council] proposed that the regulatory definition of employer explicitly exclude from liability for statutory violations individuals, such as managers or supervisors, who are not directly responsible for paying wages to employees. . . . The Department has considered this comment and disagrees with the conclusion reached by the commenter. In comparison to the ADA, the ADEA, and Title VII of the Civil Rights Act, USERRA's definition of "employer" is quite different and much broader.

*Uniformed Services Employment and Reemployment Rights Act of 1994, as amended*, 70 Fed. Reg. 75,246–01 (Dec. 19, 2005) (codified at 20 C.F.R. Part 1002). Courts have done the same. *See, e.g.*, *Croft v. Vill. of Newark*, 35 F. Supp. 3d 359, 367–68 (W.D.N.Y. 2014); *Risner v. Ohio Dep't of Rehab. & Corr.*, 577 F. Supp. 2d 953, 967 (N.D. Ohio 2008); *Brandsasse v. City of Suffolk*, 72 F. Supp. 2d 608, 618 (E.D. Va.

1999).  Moreover, the remedies available under USERRA may just as easily be applied to individuals acting under color of state law as to entities.  If the individual defendants are held liable for violating USERRA, the Court may enjoin them from implementing a discriminatory policy in the future, and it may require them to compensate Bello for the monetary damages he incurred.  For these reasons, the Court concludes that Bello may assert USERRA claims against individuals who meet the statutory definition of "employer."

Defendants' argument regarding Krupnik's liability, however, has merit.  Bello's only contention concerning Krupnik is that he initiated "the entire chain of events" and "was involved in discussions with the other Defendants regarding the proposed change to the Village's scheduling practice."  Pl.'s Mem., dkt. no. 79, at 8.  The evidence does not indicate, and Bello does not argue, that Krupnik actually had the authority to make final decisions as to scheduling; that decision was the combined result of the work of Ballowe, Scarpelli, and Lopez.  Even cast in the light most favorable to Bello, a reasonable jury could find only that Krupnik was the first to question whether Bello's practice of requesting military leave for drills in addition to nine RDOs each month was compliant with Village policy and that Krupnik asked decision makers with the Village and the police department to weigh in.  This is insufficient to support liability under USERRA.

The Court turns to the merits of Bello's USERRA discrimination claim.  Bello contends that after June 2013, the Village and its decision makers refused to grant his requests for paid military leave to attend military drills in addition to nine unpaid RDOs but did not apply this strict rule to officers requesting other forms of leave, including paid

jury duty leave, paid bereavement leave, or paid emergency leave. Defendants, on the

other hand, argue that the evidence shows that every patrol officer gets nine RDOs per

month and that an officer may not schedule a workday for a day he knows in advance

he will not be available to work. Relying, as they did in their motion to dismiss, on

*Crews v. City of Mt. Vernon*, 567 F.3d 860 (7th Cir. 2009), defendants argue that when

they made the determination to revert to their old practice of requiring reservists to

request RDOs for their monthly drills, they simply rescinded a "preferential work

scheduling policy that the Department previously extended to [reservist] employees,"

the type of policy that the court in *Crews* held was not a "benefit of employment" within

the meaning of section 4311(a) or section 4316(b)(1). *Crews*, 567 F.3d at 865–66. As

the court reiterated in *Crews*, it is well established law in the Seventh Circuit that

reservists "are not entitled to preferential policies that allow them to resolve conflicts

between work schedules and [military] training." *Id.* at 865 (citing *Pignato v. Am. Trans

Air, Inc.*, 14 F.3d 342, 349–50 (7th Cir. 1994)).

It is important to carefully define the matter at issue on Bello's USERRA

discrimination claim. The question under USERRA is *not* whether Bello must be

permitted to take nine unpaid days off every month and not be required to use any for

military duty. Rather, the crucial question is whether the Village and its decision makers

treat requests for military leave less favorably than requests for other forms of paid

leave. For Bello to secure summary judgment in his favor, the evidence must establish

that in contrast to other types of paid leave requests, Village decision makers denied

officers' requests for military leave and them converted to unpaid days off. For

defendants to prevail on the discrimination claim, the evidence must establish that after

June 2013, officers who knew in advance that they would be unavailable to work for some reason—a funeral, a doctor's appointment, jury duty, etc.—and requested bereavement leave, jury duty leave, emergency leave, or another type of leave were uniformly required to instead use RDOs for the time they would miss.

The evidence does not indisputably show either of these things. Bello points to two items of evidence. First, he relies on Scarpelli's deposition testimony as the Village's Rule 30(b)(6) designee regarding the criteria the Village used to schedule leave and RDOs during the relevant time period. In particular, Bello cites the following testimony, which he contends includes an admission by Scarpelli that military leave is treated differently from all other types of leave:

> Q: And based on what Christa Ballowe told you, that military service members have to schedule their military leave for drills on their days off, are you aware of any other leave that is supposed to be scheduled that way?
>
> [DEFENSE COUNSEL]: Objection. Asked and answered. Form of the question.
>
> THE WITNESS: I don't know.
>
> Q: That's the only one you are aware of sitting here today?
>
> A: Yes.

Pl.'s Ex. 7, dkt. no. 80-3, at 203.

Second, Bello relies on Plaintiff's Exhibit E, which consists of schedule charts for three other officers whose approved schedules appear to show four separate occasions after June 2013 on which those officers took at least one day of paid leave in addition to nine RDOs in a single month. This exhibit reveals that in May 2014, one patrol officer took nine RDOs plus one day of jury leave; in November 2014, another officer took nine

RDOs plus one day of bereavement leave; and another officer took nine RDOs in November 2014 and nine RDOs in December 2014 in addition to three and five days of emergency leave respectively.

Defendants do not dispute that these three officers, on these four occasions after June 2013, took at least one day of paid leave in addition to nine RDOs in a month, while defendants continued to require Bello to schedule unpaid RDOs rather than paid military leave for his monthly drills. Instead, they argue that the Court should not consider Exhibit E because its contents are not properly authenticated. This argument lacks merit. The schedules in Plaintiff's Exhibit E were produced in discovery by the Village. Although courts are typically forbidden from considering unauthenticated documents at summary judgment, "[a]uthentication relates only to whether the documents originated from [their source]; it is not synonymous to vouching for the accuracy of the information contained in those records." *United States v. Brown*, 688 F.2d 1112, 1116 (7th Cir. 1982). Therefore, the "very act of production [is] implicit authentication." *Id.*; *see also Thanongsinh v. Bd. of Educ., Dist. U-46*, 462 F.3d 762, 779 (7th Cir. 2006) ("Requiring authenticating affidavits . . . would be an empty formality" where the defendant drafted certain documents and produced them during discovery.).

Taken together, however, Exhibit E and Scarpelli's testimony are insufficient to secure summary judgment in Bello's favor. First, it is true, as Bello says, that the Village was required to properly prepare Scarpelli as its 30(b)(6) designee and is bound by the answers he gave in his deposition. Scarpelli's testimony is indeed damaging to defendants' case, but it does not rise to the level of a judicial admission; instead, it is

simply evidence that a trier of fact may consider alongside other evidence. *See A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001) (holding that "testimony given at a Rule 30(b)(6) deposition is evidence which, like any other deposition testimony, can be contradicted and used for impeachment purposes," and that the "testimony of Rule 30(b)(6) designee does not bind [a] corporation in [the] sense of judicial admission"). Second, although the charts contained in Exhibit E show that other officers were granted at least one day of paid leave in addition to their nine RDOs, they are not indisputable proof of unequal treatment. Specifically, because the charts do not demonstrate that these leave dates were requested in advance, they do not prove that requests for military leave were treated differently from requests for other forms of leave. These charts make it possible for a jury to conclude that military leave requests were treated differently from other leave requests after June 2013. But a reasonable jury would not have to reach that conclusion based on the evidence presented.

Although not enough to alone prove Bello's case, Exhibit E is sufficient to defeat defendants' motion for summary judgment. Yet defendants contend that the record indisputably shows that military leave is treated exactly like other forms of leave. To support this contention, defendants rely heavily on Defendants' Exhibits 35 and 36. Exhibit 35 contains two charts compiled by defense counsel, one showing every officer's requested days off as compared to their approved days off for March 2013, and another showing the same for November 2014. *See* Defs.' Ex. 35, dkt. no. 77-36, at 1–8. Exhibit 36 is an affidavit from Scarpelli in which he states, based on his review of the charts and his knowledge of department practices, that the department has long treated

all kinds of leave equally. *See* Defs.' Ex. 36, dkt. no. 77-37, at 1–5. Scarpelli draws attention to the March 2013 chart, in which some officers were required to schedule RDOs instead of emergency leave, and the November 2014 chart, in which no officer was granted nine RDOs in addition to paid leave. Bello contests the propriety of these exhibits. He claims they were not tendered during discovery but are nevertheless being used as substantive evidence intended to salvage contradictory and problematic testimony Scarpelli offered in his deposition as the Village's Rule 30(b)(6) witness.

The Court need not address the admissibility of these exhibits at this juncture, because even if the charts and Scarpelli's affidavit are admissible evidence, they do not carry the day for defendants on summary judgment. The department's behavior before June 2013 is largely immaterial regarding whether the Village, after that date, imposed a strict, no-exceptions policy on officers seeking paid leave for military obligations that it did not impose on officers seeking paid leave for non-military obligations. The November 2014 chart likewise does little to prove that after June 2013, all requests for leave in addition to nine RDOs were treated the way Bello's requests for military leave were treated. It references no requests for sick, bereavement, emergency, or jury duty leave; it shows the department requiring some officers seeking vacation to schedule RDOs for some of their vacation days while granting other requests without converting them to RDOs; and it shows some officers who requested and were granted paid holiday leave in addition to their nine RDOs.

A genuine dispute of material fact exists, so the Court declines to enter summary judgment in either side's favor on Bello's claim of discrimination under USERRA against the Village, Ballowe, Lopez, or Scarpelli. Krupnik, however, is entitled to summary

judgment on count 1.

**B.     Retaliation claims under USERRA and IWA**

Bello also alleges that defendants retaliated against him, in violation of USERRA and IWA, for seeking to vindicate his rights under federal and state law.  Under USERRA, no employer may "discriminate in employment against or take any adverse employment action against any person because such person . . . has taken an action to enforce a protection afforded any person under this chapter . . . or . . . has exercised a right provided for in this chapter."  38 U.S.C. § 4311(b).  An employer engages in prohibited conduct when the employee's action to enforce or exercise a right provided under USERRA is "a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such person's enforcement action . . . or exercise of a right."  *Id.* § 4311(c)(2).  To succeed on his USERRA retaliation claim, Bello must show that he engaged in activity protected under the statute and that the defendants took an adverse employment action against him as a result.  *See Gross v. PPG Indus., Inc.*, 636 F.3d 884, 892 (7th Cir. 2011).  Bello contends that defendants retaliated against him by directing him to attend counseling and an FFD examination, assigning him to desk duty while he participated in counseling, instructing him to stop emailing Ballowe, and requiring him to serve a one-day suspension.

Defendants contend that only the last of these employment actions triggers potential liability. The Seventh Circuit has held that "the same requirement of a 'materially adverse' employment action that applies under other civil rights statutes is applicable under USERRA."  *Id.*  This means defendants' actions must "significantly

alter[] the terms or conditions" of Bello's employment.  *Crews*, 567 F.3d at 869 (internal

quotations omitted).  Defendants argue that requiring an officer to attend EAP and FFD

evaluations and counseling, assigning him to desk duty, and giving him an order to

refrain from contacting a Village employee might have displeased Bello, but "not

everything that makes an employee unhappy is an actionable adverse action."  *Cole v.*

*State of Illinois*, 562 F.3d 812, 816–17 (7th Cir. 2009) (internal quotations and citation

omitted).

Bello argues that all of defendants' actions qualify as "materially adverse" actions

because they dissuaded Officer Howe from complaining about the Village's military

leave policy.  This matters, says Bello, because the materiality requirement derives from

the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White*,

548 U.S. 53 (2006), in which the Court held that employment action is "materially

adverse" if it "well might have dissuaded a reasonable worker from making or

supporting a charge of discrimination."  *Id.* at 68 (internal quotation marks omitted).

The test for whether employment action is "materially adverse" is an objective

one.  *See Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) ("Federal law

protects an employee only from retaliation that produces an injury, and, therefore, an

employer's retaliatory conduct is actionable only if it would be materially adverse to a

reasonable employee.").  This does not mean, however, that evidence of a similarly

situated employee's subjective feelings are immaterial to the inquiry.  The Supreme

Court has stated that what constitutes "materially adverse" action is context-specific.

*See Burlington Northern*, 548 U.S. at 69 ("[T]he significance of any given act of

retaliation will often depend upon the particular circumstances.  Context matters.").  The

fact that Officer Howe was dissuaded from complaining might support the argument that the actions defendants took against Bello, taken together, were "materially adverse."

Regardless, defendants concede that the imposition of an unpaid one-day suspension is "materially adverse" employment action. The question, then, is whether defendants' acts up to and including suspending Bello were retaliatory. To prove his retaliation claim, Bello must show that his protected activity was a "motivating factor" in defendants' decision to discipline him. 38 U.S.C. § 4311(c)(2).

Although the Seventh Circuit has not directly confronted the issue, courts have uniformly applied to USERRA retaliation claims the burden-shifting scheme applicable to claims brought under other federal antidiscrimination statutes. *See, e.g.*, *McMahon v. Salmond*, 573 F. App'x 128, 134 (3d Cir. 2014); *Escher v. BWXT Y-12, LLC*, 627 F.3d 1020, 1026 (6th Cir. 2010); *Gagnon v. Sprint Corp.*, 284 F.3d 839, 853 (8th Cir. 2002); *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001). This means Bello may establish retaliation by either the direct or indirect method of proof. *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012). Under the indirect method, Bello faces the initial burden of establishing a prima facie case of retaliation by showing that (1) he engaged in activity protected by USERRA; (2) he was meeting his employer's legitimate expectations; (3) he suffered adverse employment action; and (4) another similarly situated person who did not engage in protected activity was treated more favorably. If he does so, the burden shifts to the defendants to provide a non-retaliatory justification for taking adverse action. If defendants can offer a legitimate explanation, the burden shifts back to Bello to show that defendants' proffered reason is pretextual.

To establish retaliation under the direct method, Bello must show that (1) he

engaged in protected activity; (2) defendants took adverse action against him; and (3) there was a causal connection between his protected activity and the adverse action. He may show causation by direct evidence—"something akin to an admission by the employer ('I'm firing you because you had the nerve to accuse me of sex discrimination!')," *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011)— or by presenting a "convincing mosaic of circumstantial evidence that would permit the same inference without the employer's admission." *Coleman*, 667 F.3d at 860 (internal quotation marks omitted). Bello seems to confuse the difference between the direct and indirect methods of proof with the difference, when proving causation under the direct method, between using direct evidence and using circumstantial evidence. He claims to be pursuing the indirect method of proof, but he asks the Court to find causation based on the "convincing mosaic" of circumstantial evidence, an approach taken under the direct method of proof. *See* Pl.'s Resp. Mem., dkt. no. 93, at 23; *Coleman*, 667 F.3d at 860.

In this case, it does not really matter which method of proof Bello chooses to pursue because Bello has produced evidence sufficient to withstand summary judgment. First, it is undisputed that he engaged in protected activity (by seeking to enforce his rights) and suffered adverse employment action (when he was suspended). Second, Bello has adduced evidence that would permit a reasonable jury to find that he was meeting his employer's legitimate expectations. The record shows that Bello had no formal written reprimands on his record prior to the incident giving rise to this suit and that he had received commendations on his performance as a member of the Skokie Police Department.

Finally, with regard to causation, Bello has produced evidence of a similarly situated officer who did not engage in protected activity and was treated more favorably. A plaintiff may use comparator evidence to carry his burden under either method of proof. Specifically, Bello points to the affidavit of Officer Mynor Chang, another Marine who regularly responded "kill" during roll call throughout his time as a patrol officer with the Skokie Police Department, both prior to and following Bello's reprimand. Officer Chang never engaged in protected activity, and he was never disciplined for responding "kill" in roll call, either before or after Bello was instructed not to say it and punished for continuing to do so.

Defendants attempt to frame the issue differently. It is undisputed that the department's rules and regulations state that officers "shall, at all times, respond to the lawful orders of supervisory officers and other proper authorities," and they define "insubordination" as the "[f]ailure or deliberate refusal of any member or employee to promptly obey a lawful order given by a supervisor, including any order relayed from a supervisor by a member or employee of the same or lesser rank." Defs.' Ex. 25, dkt. no. 77-26, at 14–15. Bello admits that he was given a direct order to desist from responding "kill" during roll call, and he does not dispute that he failed to obey this lawful order. Defendants argue that Chang is not an adequate comparator, because unlike Bello, he never defied a direct order.

The Court disagrees. Bello has adduced evidence that shows that two officers both responded "kill" in roll call, but only the officer who engaged in protected activity was ordered to stop and then disciplined for failing to do so. A reasonable jury could find Bello and Chang engaged in the same conduct but were treated differently, in that

Chang's conduct was ignored. Such differential treatment would be sufficient to permit a reasonable jury to find that Bello's protected activity motivated defendants' adverse employment action. Accordingly, the Court denies defendants' motion for summary judgment on Bello's USERRA retaliation claim.

The same reasoning applies to Bello's IWA claim. The IWA prohibits an employer from "retaliat[ing] against an employee who discloses information in a court, an administrative hearing, or before a legislative commission or committee, or in any other proceeding, where the employee has reasonable cause to believe that the information discloses a violation of State or Federal law, rule, or regulation." 740 ILCS 174/15. To state a claim for retaliatory discharge under IWA, the employee must do more than merely voice his suspicion of unlawful conduct—he must actually report the suspected violation of state or federal law to authorities. *See Brame v. City of N. Chicago*, 2011 IL App (2d) 100760 ¶ 8, 955 N.E.2d 1269, 1271 (2011). Few courts have interpreted the IWA, but it is sufficiently clear from the language of the statute that a plaintiff may only prove an IWA claim by showing that he engaged in protected whistleblowing activity, suffered adverse employment action, and his employer retaliated against him as a result.

Bello has adduced sufficient evidence for a reasonable jury to find that his suspension was retaliatory. Causation is part and parcel of retaliation; as Illinois courts have held in the context of the retaliatory discharge tort, "the crux of causation in retaliatory discharge actions is the question of whether the employer had a retaliatory motive." *Michael v. Precision All. Grp., LLC*, 2011 IL App (5th) 100089 ¶ 25, 952 N.E.2d 682, 688 (2011). Causation cannot be shown where the employer has a valid, non-

pretextual reason for taking adverse employment action. *See Bourbon v. Kmart Corp.*, 223 F.3d 469, 473 (7th Cir. 2000) (citing *Hartlein v. Ill. Power Co.*, 151 Ill. 2d 142, 601 N.E.2d 720 (1992)). But in light of the comparator evidence that Bello has produced, a reasonable jury could find that Bello's effort to secure his rights under state and federal law caused the adverse employment action he suffered, for the same reasons that the circumstantial evidence in this case suggests causation under USERRA.

Defendants contend that even if Bello has produced evidence that can prove his prima facie case under IWA, summary judgment should be granted as to the individual defendants because the IWA does not impose individual liability. The Court already rejected this argument in denying defendants' motion to dismiss. *See Bello v. Vill. of Skokie*, No. 14 C 1718, 2014 WL 4344391, at *8–9 (N.D. Ill. Sep. 2, 2014). The IWA includes in its definition of employer "any person acting . . . on behalf of [an entity] in dealing with its employees." 740 ILCS 174/5. "In this way, the statute makes it clear that individuals acting on behalf of an entity that one might colloquially understand to be a person's 'employer' may likewise be considered 'employers' potentially liable for violating the statute." *Bello*, 2014 WL 4344391, at *9.

Finally, defendants argue that the individual defendants are immune from IWA liability pursuant to the Tort Immunity Act (TIA). The Court looks to state immunity rules to determine whether a defendant is immune from liability under state law. *See Fields v. Wharrie*, 740 F.3d 1107, 1115 (7th Cir. 2014); *Benning v. Bd. of Regents of Regency Univs.*, 928 F.2d 775, 777 (7th Cir. 1991). Because immunity is an affirmative defense, the burden is on the defendants to establish that the TIA bars liability, and the Act is "strictly construed against the public entities involved." *Van Meter v. Darien Park Dist.*,

207 Ill. 2d 359, 370, 799 N.E.2d 273, 280 (2003).

Section 2–201 of the TIA provides that "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused."  745 ILCS 10/2–201.  An official is entitled to immunity under section 2–201 only if the action that caused a plaintiff's injury was "both a determination of policy and an exercise of discretion."  *Harrison v. Hardin Cty. Cmty. Unit Sch. Dist. No. 1*, 197 Ill. 2d 466, 472, 758 N.E.2d 848, 852 (2001).  Illinois courts have interpreted this provision of the TIA to protect public officials "from liability for injuries caused by discretionary acts, but not from those caused by ministerial acts."  *Stratman v. Brent*, 291 Ill. App. 3d 123, 130, 683 N.E.2d 951, 955 (1997).  "[D]iscretionary acts are those which are unique to a particular public office," while ministerial acts are acts that "a person performs on a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, and without reference to the official's discretion as to the propriety of the act."  *Harrison*, 197 Ill. 2d at 472, 758 N.E.2d at 852 (internal quotation marks and citation omitted).  Policy decisions are "those that require the governmental entity or employee to balance competing interests and to make a judgment call as to what solutions will best serve each of those interests."  *Id.*

The decisions that the individual defendants made regarding Bello's discipline are discretionary as that word is understood under the TIA, because defendants made decisions, without a prescribed mandate, that only they (as Bello's superiors) were entitled to make.  *See Johnson v. Mers*, 279 Ill. App. 3d, 372, 380, 664 N.E.2d 668, 675

(1996); *cf. Stratman*, 291 Ill. App. 3d at 131, 683 N.E.2d at 957 (decisions are not discretionary where they are not unique to defendant's public office). But if defendants were retaliating against Bello when they ordered him to cease responding "kill" in roll call, ordered him to attend counseling, and suspended him, they were not balancing competing interests, and they are not entitled to immunity under the TIA. *See Weiler v. Vill. of Oak Lawn*, 86 F. Supp. 3d 874, 885–86 (N.D. Ill. 2015). Like *Weiler*, this case is reminiscent of *Valentino v. Village of South Chicago Heights*, 575 F.3d 664 (7th Cir. 2009), in which the Seventh Circuit stated that a "one-time decision to fire one employee [] does not amount to a 'judgment call between competing interests.' In fact, we are at a loss to identify any competing interests at all." *Id.* at 679 (quoting *Van Meter*, 207 Ill. 2d at 379, 799 N.E.2d at 285).

For these reasons, defendants are not entitled to summary judgment on counts 2 and 3.

## C.    IMLOAA claim

It appears that no court has yet analyzed any question of liability under Illinois's Military Leave of Absence Act (IMLOAA). IMLOAA provides that "[a]ny full-time employee of . . . a unit of local government . . . who is a member of any reserve component of the United States Armed Forces . . . shall be granted leave from his or her public employment for any period actively spent in military service." 5 ILCS 325/1(a). "Military service" under the statute includes basic training, special or advanced training, annual training, and "any other training or duty required by the United States Armed Forces." *Id.* § 1(a)(1)–(4). The statute further provides:

> During leaves for basic training, for up to 60 days of special or advanced
> training, and for any other training or duty required by the United States

Armed Forces, if the employee's daily rate of compensation for military activities is less than his or her daily rate of compensation as a public employee, he or she shall receive his or her regular compensation as a public employee minus the amount of his or her base pay for military activities.

*Id.* § 1(a).

Defendants argue for summary judgment on Bello's IMLOAA claim on four grounds. First, they argue that the Court should accord deference to the IDHR's interpretation of IMLOAA, which defendants say IDHR provided in its order dismissing Bello's claim for lack of substantial evidence. Second, they argue that even without deferring to the agency's interpretation of the statute, the Court should grant summary judgment because the evidence shows that defendants complied with IMLOAA's requirements. Third, they argue that the Tort Immunity Act immunizes the Village from liability under IMLOAA. Fourth, defendants contend that the IMLOAA claim must be dismissed because it is procedurally improper, because the CBA requires grieving employees to advance their grievances through arbitration in order to exhaust contractual remedies before resorting to litigation.

As an initial matter, the Court declines defendants' request to defer to the IDHR. Bello contends that deference should not be accorded to the IDHR's decision because it is the Illinois Human Rights Commission, not the IDHR, that "administers" the IHRA. But IMLOAA provides that a violation "constitutes a civil rights violation under the Illinois Human Rights Act," (IHRA), *id.* § 1.01, and a person may bring a charge under the IHRA before the IDHR, which is vested by statute with the authority to "issue, receive, investigate, conciliate, settle, and dismiss charges" under the IHRA. 775 ILCS 5/7-101(B). And in any event, the Court is unaware of any rule of law that states that only

one administrative body may be said to administer a statute, and Bello cites no case that supports this proposition. The IDHR's decision in Bello's administrative action, however, did not offer the agency's interpretation of the statute. The IDHR simply concluded that there was not sufficient evidence to support a claim that Bello was denied employment benefits in violation of IMLOAA. *See* Defs.' Ex. 34, dkt. no. 34, at 7. There is no reasoning or legal analysis in the IDHR's notice of dismissal to which the Court can defer. That aside, the IHRA specifically permits a party whose charge is dismissed to file suit in court, which makes it highly unlikely that the Illinois legislature intended for courts to defer to the IDHR's resolution of a charge.

The next question concerns whether Bello has offered evidence of conduct by defendants that violates IMLOAA. Bello argues that IMLOAA requires the Village to grant him paid military leave every time he attends monthly drills. He argues that the Illinois legislature enacted a broad statute that, under Illinois rules of statutory construction, should be construed broadly.

IMLOAA states that an employer must grant an employee "leave" to attend any "training or duty required by the United States Armed Forces," and that during leave, if the compensation offered by the military is less than the compensation the employee receives in his job, the employer shall pay the employee the difference. "The language of [a] statute must be afforded its plain, ordinary and popularly understood meaning, and we are to give the statutory language the fullest, rather than the narrowest, possible meaning to which it is susceptible." *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 279, 786 N.E.2d 139, 151 (2003). Courts therefore should not read into statutes "exceptions, limitations or conditions that the legislature did not express." *Petersen v.*

*Wallach*, 198 Ill. 2d 439, 446, 764 N.E.2d 19, 23 (2002). There is no exception for monthly drills, says Bello, and it would be wrong to read one into the statute.

Three other jurisprudential rules, however, weigh in favor of defendants on this matter of first impression. The first two are the rule of statutory construction that a court's primary objective is "to ascertain and give effect to the intention of the legislature," *Cryns*, 203 Ill. 2d at 279, 786 N.E.2d at 150, and the corresponding rule that the language of a statute is "the best indication of [legislative] intent." *Metzger v. DaRosa*, 209 Ill. 2d 30, 34–35, 805 N.E.2d 1165, 1167 (2004). The third is the principle that federal courts answering novel questions of state law should err on the side of restricting liability rather than expanding it. *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635–36 (7th Cir. 2007). "Federal courts are loathe to fiddle around with state law. Though district courts may try to determine how the state courts would rule on an unclear area of state law, district courts are encouraged to dismiss actions based on novel state law claims." *Insola v. Philip Morris Inc.*, 216 F.3d 596, 607 (7th Cir. 2007).

The language of IMLOAA is not as expansive as Bello claims. The statute does not require an employer to give an employee paid leave every time he must participate in military training. Rather, it requires an employer to grant leave for an employee to attend military training and to pay any difference between the employee's military compensation for that day and what his ordinary compensation for that day would have been. It is undisputed that Bello has never been denied time off to attend his monthly drills. And when Bello attends a monthly drill on an RDO, his ordinary compensation does not exceed his military compensation, because his ordinary compensation on an RDO is zero. For this reason, IMLOAA did not require defendants to pay Bello for his

military leave on RDOs. Were the statute read as Bello argues, it would require Illinois employers to pay their reservist employees for the weekend days on which they participate in military drill, even if the employee does not work weekends and is not paid for weekend days. There is nothing in the text or purpose of IMLOAA that suggests this is what the Illinois legislature intended.

For these reasons, the Court grants summary judgment in favor of defendants on count 4. In light of that ruling, the Court need not address defendants' arguments based on the Tort Immunity Act or the collective bargaining agreement.

## Conclusion

For the foregoing reasons, the Court grants defendants' motion for summary judgment on plaintiff's IMLOAA claim (Count 4) and also grants summary judgment in defendant Krupnik's favor on plaintiff's USERRA discrimination claim (Count 1) but otherwise denies defendants' motion [dkt. no. 74]. The Court denies plaintiff's motion for summary judgment in its entirety [dkt. no. 78]. The case is set for a status hearing on January 7, 2016 for the purpose of setting a trial date and discussing the possibility of settlement.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: December 31, 2015